# In the United States Court of Federal Claims

No. 19-1715C

(Filed:  October 20, 2022)

| | |
|---|---|
| **SENOL OZTIMURLENK, R.N.,** *et al.*, | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE UNITED STATES,** | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

*Jacob Y. Statman*, Snider & Associates, LLC, Baltimore, MD, for Plaintiff.  Of counsel was *Jason I. Weisbrot*.

*Liridona Sinani*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With her on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, *Martin F. Hockey, Jr.*, Acting Director, and *Elizabeth M. Hosford*, Assistant Director.  Of counsel were *Mark Frassinelli* and *Barbara Burke*, Office of General Counsel, United States Department of Veterans Affairs, Washington, D.C.

## OPINION AND ORDER

***SOLOMSON*, Judge.**

Plaintiffs, current and former nurses employed at the Northport Veterans Affairs Medical Center in Northport, New York, have sued to recover overtime pay allegedly owed for work performed outside regularly scheduled tours of duty.  Pending before the Court is Plaintiffs' motion for class certification pursuant to Rule 23 of the Rules of the Court of Federal Claims ("RCFC").  Defendant, the United States, acting by and through the Department of Veterans Affairs (the "VA"), opposes the motion.

For the reasons set forth below, the Court DENIES Plaintiffs' motion without prejudice.

## I.   PROCEDURAL HISTORY

On November 5, 2019, Plaintiffs filed suit in this Court to recover overtime compensation pursuant to 38 U.S.C. § 7453.  ECF No. 1.  On February 19, 2020, Plaintiffs filed their first amended complaint.  ECF No. 9.  On May 26, 2020, the government filed its answer.  ECF No. 12.  On September 22, 2020, with permission from the Court, Plaintiffs filed their second amended complaint.  ECF No. 18 ("Sec. Am. Compl.").  On December 16, 2020, the government filed its answer to Plaintiffs' second amended complaint.  ECF No. 21.

As detailed in the operative complaint and the parties' joint preliminary status report, Plaintiffs seek to litigate this case as a class action.  Sec. Am. Compl. ¶¶ 1, 241; ECF. No. 13-4.  To that end, the parties engaged in class discovery from August 21, 2020, to March 22, 2021.  *See* ECF No. 15; Minute Order (Jan. 4, 2021); Minute Order (Feb. 11, 2021).  On April 28, 2021, Plaintiffs filed a motion for class certification.  ECF No. 27 ("Pl. Mot.").  On June 25, 2021, the government filed its response brief.  ECF No. 32 ("Def. Resp.").  On August 9, 2021, Plaintiffs filed their reply brief.  ECF No. 35 ("Pl. Reply").

Plaintiffs' motion for class certification proposes the following class definition:

> All persons who are past or present licensed practical and/or registered nurses employed by the VA, Northport Medical Center in Northport, New York; and who since November 5, 2013, worked at least 15 minutes of their unpaid 30-minute meal period performing patient care and clinical duties without compensation.

Pl. Mot. at 6.

On December 20, 2021, the Court held oral argument on Plaintiffs' pending motion.  *See* ECF No. 39 ("Tr.").

## II.   JURISDICTION

In this case, the Plaintiffs assert claims for overtime back pay and other monetary relief pursuant to 38 U.S.C. § 7453 and the Tucker Act, 28 U.S.C. § 1491(a).  As in *Mercier v. United States*, "[t]here is no dispute that this Court has jurisdiction over . . . the complaint, which assert[s] claims for backpay and other monetary relief based on alleged violations of 38 U.S.C. § 7453" because "[t]he statutory and regulatory provisions that form the bases for [Plaintiffs'] claims are clearly 'money-mandating,' as they require the VA 'to pay employees certain amounts under certain circumstances.'"  114 Fed. Cl. 795, 799 (2014) (quoting *Price v. Panetta*, 674 F.3d 1335, 1339 (Fed. Cir. 2012)), *rev'd in part on other grounds*, 786 F.3d 971 (Fed. Cir. 2015); *see also Austin v. United States*, 124 Fed. Cl. 410,

415 (2015) (citing *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005)); *Maine Cmty. Health Options v. United States*, -- U.S. --, 140 S. Ct. 1308, 1329 (2020) (discussing "money-mandating provisions").  Accordingly, the Court concludes that it possesses jurisdiction to decide Plaintiffs' claims and its pending class certification motion.

## III.   LEGAL AND FACTUAL BACKGROUND

### A.  VA Nurse Pay:  Law and Policies

Nurses (and other medical professionals) employed by the VA are exempt from the overtime pay provisions of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.*, and the Federal Employees Pay Act (FEPA), 5 U.S.C. § 5542, *et seq.*  Instead, VA nurses are compensated for hours worked in excess of defined limits pursuant to overtime pay provisions of Title 38 of the United States Code.[1]  Specifically, nurses are entitled to "additional pay" pursuant to 38 U.S.C. § 7453(e), which provides, in relevant part:

> (1)   A nurse performing ***officially ordered or approved*** hours of service in excess of 40 hours in an administrative workweek, or in excess of eight consecutive hours, shall receive overtime pay for each hour of such additional service.  The overtime rates shall be one and one-half times such nurse's hourly rate of basic pay.

> (2)   For the purposes of this subsection, overtime must be of at least 15 minutes duration in a day to be creditable for overtime pay.

38 U.S.C. § 7453(e) (emphasis added).  Thus, a nurse is not entitled to any overtime pay unless the overtime has been "officially ordered or approved."  *Id.*

The Federal Circuit has held that overtime work is compensable as "officially ordered or approved" where the work has been "induced" — *i.e.*, even if it was "not expressly directed."  *Mercier v. United States*, 786 F.3d 971, 981–82 (Fed. Cir. 2015) (reversing dismissal of claims for induced overtime).  In *Mercier*, the Federal Circuit

---

[1] "Concerned that the VA had been unable to attract qualified medical professionals under the civil service system's regulations and rates of pay, Congress enacted provisions specifically relating to the hiring, promotion, pay, hours and conditions of employment, retirement, and discipline of health care professionals employed by the [VA]."  *Am. Fed'n of Gov't Emps. Local 3884 v. Fed. Lab. Rels. Auth.*, 930 F.2d 1315, 1318 (8th Cir. 1991).  "The Title 38 system provides the Secretary of the Department of Veterans Affairs . . . greater flexibility in hiring, firing and compensating employees than otherwise available under the Title 5 system."  *Curry v. United States*, 66 Fed. Cl. 593, 595 (2005).

3

interpreted 38 U.S.C. § 7453(e) without deferring to the VA's view of the statute for the simple reason that the agency had not issued any relevant formal regulatory interpretation or informal guidance. *Id.* at 972 & n.1 ("[T]he agency has not enacted any regulation interpreting the statute as mandating any particular procedure that must be followed to qualify for overtime pay. . . . [T]he handbook . . . fails to describe any procedure under which nurses' overtime may be explicitly ordered or approved."). In concluding that a showing of inducement sufficed to obtain overtime pay, the Federal Circuit distinguished the Title 38 overtime provision at issue here from the FLSA's requirements.[2]  According to the Federal Circuit, "*FLSA's* standard compensates overtime work which the employer merely 'knows or has reason to believe' the employee is performing, as well as overtime the employer induces." *Mercier*, 786 F.3d at 981 (emphasis added) (citing 29 C.F.R. § 785.11 (2015)). In contrast, "the narrower phrase 'ordered or approved' [in Title 38] suggests that its coverage is not so broad as FLSA's"; management's "mere knowledge" of overtime is insufficient for the purposes of 38 U.S.C. § 7453(e). *Id.* (first citing *Doe v. United States*, 372 F.3d 1347, 1361 (Fed. Cir. 2004); and then citing *Bilello v. United States*, 174 Ct. Cl. 1253, 1257 (1966) (per curiam)). "Inducement" of overtime, however, is sufficient to trigger the government's liability. *Id.*

VA policies have operationalized 38 U.S.C. § 7453(e) and defined its terms.[3] An "administrative workweek" is "[a] period of seven consecutive calendar days, which coincide with the calendar week, Sunday through Saturday." U.S. Dep't of Veterans Affs., Handbook 5011 pt. II, ch. 3 at II-25, II-31a, II-40 (2018) [hereinafter VA Handbook 5011]. Nurses have the option of working (1) a "traditional work schedule" (eight hours per day, forty hours per week "with fixed starting and quitting times"), or (2) an

---

[2] *Mercier* followed precedent that had interpreted identical statutory language (*i.e.*, "officially ordered or approved") from the FEPA, 5 U.S.C. § 5542 *et seq.*, as including inducement. *Mercier*, 786 F.3d at 980–82 ("[N]either this panel nor [another case's] court could overrule *Anderson's* interpretation that inducement satisfies FEPA's 'officially ordered or approved' requirement. . . . We presume that Congress was aware of that existing interpretation of 5 U.S.C. § 5542 when it enacted 38 U.S.C. § 7453, and that it intended for induced overtime to also be considered 'ordered or approved' under the later statute." (citing *Anderson v. United States*, 136 Ct. Cl. 365 (1956) (en banc))).

[3] The VA "has not issued a comprehensive set of regulations implementing the . . . personnel provisions in [T]itle 38[;] [i]nstead, [the VA] has set forth its interpretation of the [T]itle 38 personnel provisions in the form of manuals, directives, and handbooks[.]" *James v. Von Zemenszky*, 284 F.3d 1310, 1318–19 (Fed. Cir. 2002). These handbooks are "are akin to 'interpretations contained in policy statements, agency manuals, and enforcement guidelines,' [and] are not entitled to *Chevron* deference." *Von Zemenszky*, 284 F.3d at 1319 (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000)). Rather, the VA handbooks are afforded the lesser *Skidmore* deference "proportional to [their] 'power to persuade.'" *Id.* (alteration in original) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001)) (referring to *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

"[a]lternative work schedule," which "consists of either a flexible work schedule or compressed work schedule." *Id.* at II-31a.

In 2017, presumably in response to *Mercier*, 786 F.3d at 980–82, the VA revised its Pay Administration handbook to implement 38 U.S.C. § 7453(e), as follows:

> (1) Overtime resulting from either a solicitation initiated by management or at the request of the employee is considered to be voluntary overtime.

> (2) Employees are authorized to work voluntary overtime when the overtime has been approved either verbally or in writing, in advance, by an appropriate management official or his/her designee, as determined in accordance with VA Handbook 5011 and local policy.

> (3) When an employee has not requested authorization in advance for overtime from an appropriate management official or his designee, an employee may submit a written request for after-the-fact authorization. The written request should be submitted as soon as possible, typically within the pay period when the voluntary overtime was worked, to an appropriate management official or his/her designee. In such cases, the decision to authorize the overtime is at the discretion of management. Employees who work overtime without advance authorization are not guaranteed to ultimately receive authorization or compensation for the overtime.

U.S. Dep't of Veterans Affs., Handbook 5007 pt. V, ch. 2 at V-3 to -3a (2021) (cleaned up) [hereinafter VA Handbook 5007].[4]

Accordingly, at least pursuant to the latest version of VA Handbook 5007, a nurse employed by the VA may be entitled to overtime pay either where it is (a) pre-approved, *or* (b) approved "after-the-fact." There are three conditions for pre-approved overtime: (1) the nurse must have worked more than forty hours in a single week or more than eight consecutive hours; (2) the overtime work must have been officially ordered or

---

[4] VA Handbook 5007 is online at: https://www.va.gov/vapubs/viewPublication.asp?Pub_ID =1270&FType=2. The text of the referenced Handbook reflects numerous revisions (*e.g.,* via scattered bracket symbols not necessarily enclosing any text, sentences and phrases in various colors, pages seemingly added after the fact between other pages, and a variety of revision dates, depending upon the page). The Court nevertheless has quoted and cited the latest version of the Handbook, removing extraneous symbols and notations in the process.

approved in writing or verbally in advance by a superior; and (3) the overtime work must have lasted for at least 15 minutes.  VA Handbook 5007 at V-3 to -3a; *see also* 38 U.S.C. § 7453(e).  For "after-the-fact" approval, a nurse must submit a written request but such approval is discretionary and "not guaranteed."  VA Handbook 5007 pt. V, ch. 2 at V-3a.[5]

### B.  Plaintiffs' Claims and Class Certification Motion

Plaintiffs allege they are current and former registered nurses or licensed practical nurses employed by the VA at the Northport Veterans Affairs Medical Center in Northport, New York, since November 5, 2013.  Sec. Am. Compl. ¶¶ 1, 214, 241; Pl. Mot. at 6–7.  Plaintiffs were appointed to their positions pursuant to 38 U.S.C. §§ 7401(1) and (3).[6]  Sec. Am. Compl. ¶ 214; Pl. Mot. at 7.  The crux of Plaintiffs' allegations is that they were "expected, required, and induced" to work without compensation "on a recurring and involuntary basis . . . additional hours in excess of fifteen minutes in a calendar day, in excess of forty (40) hours in an administrative workweek, in excess of eight (8) consecutive hours in a workday, or in excess of their daily work requirements . . . during their unpaid meal period to ensure that patient care was not compromised."  Sec. Am. Compl. ¶¶ 223; Pl. Mot. at 7, 11 ("Their claims are limited to work performed during their thirty-minute unpaid meal period.").

According to Plaintiffs, the VA, "including nurse supervisors and/or other VA personnel with the authority to order or approve overtime work and pay, had knowledge that Plaintiffs . . . worked additional hours . . . providing clinical care."  Sec. Am. Compl. ¶ 223; Pl. Mot. at 14 ("Supervisors admitted that they had knowledge of nurses working through meal periods.").    Plaintiffs further allege that the VA's "expectation, requirement, and inducement to work those additional hours" during their breaks "constitute . . . order or approval for the additional hours worked."  Sec. Am. Compl.

---

[5] Plaintiffs acknowledge the existence of VA Handbook 5007 but assert that the statute at issue "does not require overtime order or approval to be in any particular form, and the VA has not promulgated" any related procedures.  Pl. Mot. at 8.  Plaintiffs cite the Federal Circuit's decision in *Mercier*, but otherwise do not address the updated VA Handbook 5007 language upon which the government relies.  Accordingly, Plaintiffs assume that showing "inducement" is sufficient to sustain their claims for all periods of time.  Plaintiffs' failure to address the updated VA Handbook 5007 is notable particularly because Plaintiffs elsewhere acknowledge that VA Handbook 5007 is entitled to deference.  Pl. Mot. at 8 n.1 (citing *Von Zemenszky*, 284 F.3d at 1318–19).  Indeed, Plaintiffs themselves rely extensively on provisions from various VA handbooks.  *See, e.g.*, Sec. Am. Comp. ¶¶ 216–20, 259–68 (citing VA Handbook 5007 and VA Handbook 5011 as "promulgat[ing] policies pertaining to Pay Administration for Title 38 employees").  As explained *infra*, *see* sub-subsection IV.A.1.a, this Court for the purposes of the pending motion need not resolve which Plaintiffs or claims, if any, are subject to the revised overtime guidance in the current version of VA Handbook 5007.

[6] Registered nurses are covered by 38 U.S.C. § 7401(1).  Licensed practical nurses are covered by 38 U.S.C. § 7401(3).

¶¶ 55, 253, 269. Plaintiffs claim that the VA's "willful[] fail[ure] to pay" them for their overtime work constitutes violations of 38 U.S.C. § 7453 and "VA regulations and policies." Sec. Am. Compl. ¶¶ 254, 255, 270, 271. In sum, Plaintiffs claim that they "have been financially damaged . . . and are entitled to recover . . . relief that includes, but is not limited to, any and all unpaid overtime back pay, and interest on such overtime back pay, for all additional hours worked." Sec. Am. Compl. ¶¶ 256, 272.

Plaintiffs now move to litigate their claims as a class action pursuant to RCFC 23. Pl. Mot. at 6.

### C.  Class Action Certification Requirements in the Court of Federal Claims

Class action cases are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotations omitted). Pursuant to RCFC 23, "[o]ne or more members of a class may sue as representatives on behalf of all members" if they satisfy certain requirements. RCFC 23(a). When requested via motion, the Court "must determine by order whether to certify the action as a class action." RCFC 23(c)(1)(A). Such an order "must define the class and the class claims, issues, or defenses, and must appoint class counsel." RCFC 23(c)(1)(B). If a class is certified, the Court gives notice to class members that, among other things, "the court will include in the class any member who *requests* inclusion." RCFC 23(c)(2)(B)(v) (emphasis added); *see also* RCFC 23(c)(2)(B)(iv) ("a class member *may* enter an appearance . . . if the member so desires" (emphasis added)); Rules Committee Notes on RCFC 23, 2002 revision. In other words, RCFC 23 provides for opt-in class actions only. The "objectives of the [RCFC] class action procedure" include efficient and economical litigation. *Bright v. United States*, 603 F.3d 1273, 1285, 1288 (Fed. Cir. 2010) (citing cases); *see* RCFC 23(b)(3) ("A class action may be maintained if . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.").

Before applying RCFC 23 to the facts of this case, the Court first reviews and explains each of the Rule's class certification requirements. In that regard, "[c]ertification of an opt-in class pursuant to RCFC 23 requires several elements, often summarized by this Court as the following: (1) numerosity, (2) commonality, (3) typicality, (4) adequacy, and (5) superiority." *Horvath v. United States*, 149 Fed. Cl. 735, 743 (2020) (citing *Barnes v. United States,* 68 Fed. Cl. 492 (2005)); *see also Bright*, 603 F.3d at 1278 n.2. Those requirements are defined, generally, as follows:

> (i) **numerosity** — that the proposed class is so large that joinder is impracticable; (ii) **commonality** — that there are common questions of law or fact *that predominate* over questions affecting individual prospective class members and that the government has treated the prospective class

> members similarly; (iii) **typicality** — that [the putative class representative's] claims are typical of the proposed class; (iv) **adequacy** — that [the putative class representative's] will fairly represent the proposed class; and (v) **superiority** — that a class action is the fairest and most efficient method of resolving the suit.

*Common Ground Healthcare Coop. v. United States*, 137 Fed. Cl. 630, 637 (2018) (emphasis added) (citing *Toscano v. United States*, 98 Fed. Cl. 152, 155 (2011)).  RCFC 23(a) contains the first four requirements, while RCFC 23(b)(3) contains not only the superiority requirement, but also an additional predominance requirement.[7]  The predominance requirement necessitates that the Court consider whether "the questions of law or fact *common* to class members *predominate* over any questions affecting only individual members."  RCFC 23(b)(3) (emphasis added).  Predominance is often analyzed concomitantly with the commonality requirement.[8]

   To understand these requirements in practice, cases applying Rule 23 of the Federal Rules of Civil Procedure ("FRCP") are instructive.  *Lohmann v. United States*, 154 Fed. Cl. 355, 361 (2021) ("RCFC 23, which borrowed criteria from its counterpart in the Federal Rules of Civil Procedure (with some important distinctions), governs class actions in this Court.").  The following table compares RCFC 23(a) and 23(b) to their FRCP counterparts, in relevant part (differences are highlighted by bolded, italicized text in the first column):

---

[7] The numerosity requirement is contained in RCFC 23(a)(1).  The commonality requirement is contained in RCFC 23(a)(2) but is linked to predominance and superiority in RCFC 23(b)(3).  The typicality requirement is contained in RCFC 23(a)(3).  The adequacy requirement is contained in RCFC 23(a)(4).

[8] *See, e.g.*, *Common Ground Healthcare*, 137 Fed. Cl. at 638-40 (performing "predominance inquiry" under commonality); *Elec. Welfare Tr. Fund v. United States*, 160 Fed. Cl. 462, 468 (2022) (considering predominance under "[t]he commonality requirement of RCFC 23"); *In re Upstream Addicks & Barker (Tex.) Flood-Control Reservoirs*, 157 Fed. Cl. 189, 198–99 (2021) (considering RCFC 23(b)(3) predominance requirement under commonality); *Horvath*, 149 Fed. Cl. at 743 (citing *Barnes*, 68 Fed. Cl. 492, for the proposition that predominance is considered as part of commonality); 1 William B. Rubenstein *et al.*, *Newburg and Rubenstein on Class Actions* § 3:27 (6th ed. 2022) [hereinafter 1 Rubenstein] ("[C]ourts will often treat the application of Rules 23(a)(2) and 23(b)(3) together, though typically articulating a finding as to each prong.").

| RCFC 23 | FRCP 23 |
|---|---|
| **(a)** Prerequisites.  One or more members of a class *may sue* as representative parties on behalf of all members only if: | **(a)** Prerequisites**.**  One or more members of a class may sue or be sued as representative parties on behalf of all members only if: |
| **(1)** the class is so numerous that joinder of all members is impracticable;<br>**(2)** there are questions of law or fact common to the class;<br>**(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and<br>**(4)** the representative parties will fairly and adequately protect the interests of the class. | **(1)** the class is so numerous that joinder of all members is impracticable;<br>**(2)** there are questions of law or fact common to the class;<br>**(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and<br>**(4)** the representative parties will fairly and adequately protect the interests of the class. |
| **(b)** Class Actions Maintainable.<br>A class action may be maintained if RCFC 23(a) is satisfied and if: | **(b)** Types of Class Actions.<br>A class action may be maintained if Rule 23(a) is satisfied and if: |
| **(1)** *[not used]*; | **(1)** prosecuting separate actions by or against individual class members would create a risk of:<br>**(A)** inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or<br>**(B)** adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests; |

| | |
|---|---|
| **(2)** the ***United States*** has acted or refused to act on grounds ***generally applicable*** to the class; ***and*** | **(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or |
| **(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include: | **(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include: |
| **(A)** the class members' interests in individually controlling ***the prosecution of separate actions***; | **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions; |
| **(B)** the extent and nature of any litigation concerning the controversy already ***begun by class members***; | **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members; |
| **(C)** ***[not used]***; and | **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and |
| **(D)** the likely difficulties in managing a class action. | **(D)** the likely difficulties in managing a class action. |

The above comparison demonstrates that RCFC 23 "is modeled largely on the comparable FRCP."  Rules Committee Notes on RCFC 23, 2022 Revision.  RCFC's numerosity, commonality, typicality, adequacy, superiority, and predominance requirements all have nearly matching language in FRCP 23.  Because "RCFC 23 is patterned after [FRCP] 23 . . . , with the notable exception that RCFC 23 allows only opt-in class actions . . . , case law analyzing FRCP 23 may be used to construe RCFC 23." *Silver Buckle Mines, Inc. v. United States*, 132 Fed. Cl. 77, 96 n.16 (2017) (citing *Curry v. United States*, 81 Fed. Cl. 328, 331–32 & n.10 (2008)); *see also Barnes*, 68 Fed. Cl. at 494 & n.1 ("Owing to the fact that the language of RCFC 23 and [FRCP] 23 is, in many regards, identical, this opinion relies upon numerous decisions that have construed the relevant portions of the latter rule.").  Accordingly, RCFC 23's "threshold requirements" are

generally "applicable to all class actions." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–16 (1997) (applying FRCP 23).

On the other hand, "there are significant differences between [RCFC 23 and FRCP 23]." Rules Committee Notes on RCFC 23, 2002 Revision. As illustrated above, the text of RCFC 23(a) and 23(b) differ from their analogue in FRCP 23 in several substantive ways. While FRCP 23 allows for a class consisting of plaintiffs *or defendants*,[9] RCFC 23 only allows for a class of plaintiffs, as the United States is always the defendant in this Court. *See* RCFC 4(a) (regarding service of "a complaint on the United States"); RCFC 10(a) ("complaint must name all the parties . . . with the United States designated as the party defendant").[10] Another key difference is that RCFC 23 "does not accommodate, *inter alia*, the factual situations redressable through declaratory and injunctive relief contemplated under FRCP 23(b)(1) and (b)(2)" because "the relief available in this court is generally confined to individual money claims against the United States." Rules Committee Notes on RCFC 23, 2002 Revision (explaining that "the situations justifying the use of a class action [in the Court of Federal Claims] are correspondingly narrower than those addressed in FRCP 23").[11] Finally, in contrast to FRCP 23(b)'s disjunctive requirements, RCFC 23(b)'s requirements are conjunctive.[12]

---

[9] *See* FRCP 23(a) ("One or more members of a class may sue *or be sued* as representative parties[.]" (emphasis added)); *see also, e.g.*, *Mary Kay Inc. v. Reibel*, 327 F.R.D. 127, 129–31 (N.D. Tex. 2018) (noting that "[f]ederal courts have . . . long permitted plaintiffs to move for certification of a defendant class after suing a putative class representative" but rejecting defendant's motion to certify a defendant class); 2 William B. Rubenstein *et al.*, *Newburg and Rubenstein on Class Actions* § 5:3 (6th ed. 2022) [hereinafter 2 Rubenstein] ("[D]efendant classes have been employed irregularly but in a variety of situations.").

[10] *See* RCFC 23(a) ("One or more members of a class may sue as representative parties[.]"); RCFC 23(b)(2) ("*[T]he United States* has acted or refused to act on grounds generally applicable to the class[.]" (emphasis added)).

[11] This Court previously has explained that "[t]he . . . plain language of 28 U.S.C. § 1491(a)(2) demonstrates that this Court lacks broad jurisdiction to issue equitable relief." *Sergent's Mech. Sys., Inc. v. United States*, 157 Fed. Cl. 41, 47–48 (2021) (citing *Kanemoto v. Reno*, 41 F.3d 641, 644–45 (Fed. Cir. 1994) ("The remedies available in [the Court of Federal Claims] extend only to those affording monetary relief; the court cannot entertain claims for injunctive relief or specific performance, except in narrowly defined, statutorily provided circumstances[.]")). Thus, "[t]he limiting language of 28 U.S.C. § 1491(a)(2) stands in stark contrast to that of 28 U.S.C. § 1491(b)(2), which provides the Court with broad injunctive relief power, albeit with respect to a narrower class of actions defined in § 1491(b)." *Sergent's Mech. Sys.*, 157 Fed. Cl. at 48 n.5 ("The type of relief the Court may order thus varies depending on whether an action is brought pursuant to 28 U.S.C. § 1491(a) or § 1491(b).").

[12] As *Horvath* explains:

In requiring both that the defendant acted on generally applicable grounds and that a question common to class members predominates, RCFC 23 is — by its terms

The most significant difference between the two rules, however, reaches beyond RCFC 23(a) and 23(b) class certification requirements; it is that, as noted *supra*, "unlike the FRCP, the [RCFC] contemplates only opt-in class certifications, not opt-out classes." Rules Committee Notes on RCFC 23, 2002 Revision.[13]  Opt-out class actions are "viewed as inappropriate here because of the need for specificity in money judgments against the United States, and the fact that the court's injunctive powers — the typical focus of an opt-out class — are more limited than those of a district court."  *Id.*  Because opt-in class actions are fundamentally different from the opt-out class actions FRCP 23 contemplates, cases involving the latter rule must be applied with care in this Court.[14]

In any event, "Rule 23 does not set forth a mere pleading standard."  *Dukes*, 564 U.S. at 350; *see also Jones v. United States*, 118 Fed. Cl. 728, 733 (2014) ("In determining whether [RCFC 23 requirements] . . . are met, the court must, where necessary, look beyond the pleadings, and seek to develop an understanding of the relevant claims, defenses, facts and substantive law.").  Rather, plaintiffs seeking class certification bear the burden of affirmatively establishing that the RCFC 23 requirements are "*in fact*" met.  *Dukes*, 564 U.S. at 350.  In determining whether Plaintiffs in this case have carried their burden, the Court must conduct a "rigorous analysis" and thus must probe beyond the pleadings to assess Plaintiffs' showing and proffered evidence.  *Id.* at 350–51.  Indeed,

---

— more restrictive than its sister-rule, FRCP 23, which provides a disjunctive test: it requires that a defendant act either on generally applicable grounds, **or** that common legal or factual questions predominate for a class action to be maintained.  *See* FRCP 23(b)(2)–(3).  This Court's rule is conjunctive, requiring both conditions.

149 Fed. Cl. at 745.  In addition, the comparison table above also shows that RCFC 23(b)(3)(C) differs from FRCP 23(b)(3)(C).  While the latter is concerned with concentrating litigation in one forum for efficiency purposes, that consideration is inapposite in this Court because, again, the defendant is always the United States here.  Moreover, at least for claims exceeding $10,000, this Court typically has exclusive jurisdiction.  28 U.S.C. §§ 1346(a), 1491(a)(1).

[13] *Bright*, 603 F.3d at 1277 n.1 (Fed. Cir. 2010) (noting that "[u]nder the [RCFC], in order to become a class member, an individual must affirmatively respond to a Rule 23(c)(2) notice to 'opt in' by requesting inclusion in the action" while "[u]nder the [FRCP], all members of a class are included in the action and are bound by the judgment unless they 'opt out' by affirmatively requesting exclusion" (citing RCFC 23(c)(2)–(3) and FRCP 23(c)(2)–(3))); *see also Silver Buckle Mines*, 132 Fed. Cl. at 101 ("Only one type of class action may be maintained in the Court of Federal Claims — an opt-in class action."  (first citing RCFC 23(c)(2)(B)(iv)–(v); and then citing Rules Committee Notes on RCFC 23, 2002 revision)).

[14] In *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985), the Supreme Court explained that the "goals" of "[m]odern plaintiff class actions" include "permitting litigation of a suit involving common questions when there are too many plaintiffs for proper joinder" and to "permit plaintiffs to pool claims which would be uneconomical to litigate individually."  As this decision will explain *infra*, *see* subsection III.C.1, the former consideration, for example, does not make much sense in an opt-in class action.

Rule 23 requirements "must be proven by a preponderance of the evidence." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012); *see also Common Ground Healthcare*, 137 Fed. Cl. at 637 ("The class action's proponent must satisfy each of the requirements by a preponderance of the evidence.").[15] "Mere speculation is insufficient." 687 F.3d at 596. Because RCFC 23's requirements are all stated in the conjunctive, the failure of Plaintiffs "to satisfy any one of them is fatal to class certification." *Barnes*, 68 Fed. Cl. at 494.

At the end of the day, though, "[s]o long as this rigorous analysis is conducted, the Court has wide discretion in deciding whether the requirements of RCFC 23 have been satisfied." *Horvath*, 149 Fed. Cl. at 743–44 ("Although RCFC 23 differs from FRCP 23 in important respects, both use the same permissive ('may'), not mandatory ('shall'), language in allowing a court to certify a class.").

### 1. Numerosity [RCFC 23(a)(1)]

RCFC 23(a)(1) — the "numerosity" requirement — directs that we consider whether a putative class is "so numerous that joinder of all members is impracticable." This requirement, at least in the opt-out class action context of FRCP 23, is supposed to "promote[] three core objectives." *Marcus*, 687 F.3d at 594–95.

*First*, the numerosity requirement helps to "ensure[] judicial economy . . . by freeing federal courts from the onerous rule of compulsory joinder inherited from the English Courts of Chancery and the law of equity." *Marcus*, 687 F.3d at 594 (citing 1 William B. Rubenstein *et al.*, *Newberg on Class Actions* § 1:12 (5th ed. 2011)).[16] In that regard, courts "no longer have to conduct a single, administratively burdensome action with all interested parties compelled to join and be present" and courts are "spar[ed] . . . the burden of having to decide numerous, sufficiently similar individual actions *seriatim*."

---

[15] Plaintiffs assert, contradictorily, that "[t]he party moving for class certification bears the burden of proving, by a preponderance of the evidence, that each of these requirements are met" and that "[a]t this juncture the trial court must assume the truth of the factual allegations in the Complaint[.]" Pl. Mot. at 17 (citing *Barnes*, 68 Fed. Cl. at 495). Plaintiffs' former statement is correct; the latter is not. Notably, *Barnes* was decided more than five years before *Dukes*. This Court relies on pre-*Dukes* decisions only to the extent they are consistent with *Dukes* and its progeny. A number of courts "continue" to apply standards for class certification that predate *Dukes*, 1 Rubenstein §§ 1:12, 3:11 (citing cases), but *Dukes* "clearly has heightened the scrutiny and application" of at least some class certification requirements by demanding a "rigorous analysis." 7A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1763.1 (4th ed. 2022) [hereinafter 7A Wright] (citing *Dukes*, 564 U.S. at 351, and other cases).

[16] *See also* 1 Rubenstein §§ 1:12, 3:11 ("Where many individuals have similar claims, there may be a flood of litigation. . . . Yet the vast quantity of individual litigants makes joinder impracticable. The class action solves this problem[.]" (citations omitted)). The opt-in class action, however, does not eliminate the joinder problem.

*Id.* at 594–95. *Second*, RCFC 23(a)(1) "creates greater access to judicial relief, particularly for those persons with claims that would be uneconomical to litigate individually." *Id.* (citing *Phillips Petroleum Co.*, 472 U.S. at 809).[17] *Third*, the numerosity "rule prevents putative class representatives and their counsel, when joinder can be easily accomplished, from unnecessarily depriving members of a small class of their right to a day in court to adjudicate their own claims." *Id.* at 594–95 (citing 7A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1762 (3d ed. 2005)); *see* 7A Wright § 1762.

In general, when deciding whether joinder would be impracticable, courts weigh a long and hazy list of factors. One "non-exhaustive list" of factors includes: "judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 252–53 (3d Cir. 2016). These factors also may include whether putative class plaintiffs do "not all resid[e] within a reasonable distance of this court, or any other factor which would demonstrate substantial hardship arising from their individual participation in th[e] suit." *Fewlass v. Allyn & Bacon, Inc.*, 83 F.R.D. 161, 165 (D. Mass. 1979). Such other factors include, for example, whether "potential class members may be reluctant to personally appear and prosecute their claims because of fears of reprisal from the defendant." *Id.*[18] A putative class with a large number of

___

[17] *See also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004) ("[A] class action facilitates spreading of the litigation costs among the numerous injured parties and encourages private enforcement of the statutes."); 1 Rubenstein § 3:11 ("Rule 23 enables litigation where it might otherwise not occur because of the impracticality of individuals joining together to pool their resources. It is not necessarily efficient for the litigation system itself to enable litigation in this manner, but small-claims class actions serve social efficiency goals[.]"). Another line of cases holds that "the size of the individual claims" should be considered as part of Rule 23(b)(3)'s superiority requirement, rather than Rule 23(a)(1)'s numerosity requirement. *Bell v. United States*, 123 Fed. Cl. 390, 396–97 (2015) (first quoting Rules Committee Notes on FRCP 23, 1966 revision; then citing *Rasmuson v. United States*, 91 Fed. Cl. 204, 216–17 (2010), *Barnes*, 68 Fed. Cl. at 499–500, and other cases); *see also* 2 Rubenstein § 4:65 ("A primary purpose of class action lawsuits, particularly money damages claims aggregated under [FRCP] 23(b)(3), is to enable the litigation of claims that are worth too little money to be pursued individually."). This Court is not convinced that it must choose between numerosity and superiority when considering the size of the individual claims. Class certification requires this Court to determine both that joinder is impracticable under RCFC 23(a)(1) and that, as described *infra*, a class action is superior under RCFC 23(b)(3). If the small size of individual claims makes joinder impracticable such that a class action is superior, then that consideration is relevant to both requirements. *See* 7A Wright § 1762 ("The interrelationship of the numerosity prerequisite and some of the other class-action requirements," including those in 23(b)(3), "should be noted.").

[18] *See* 7A Wright § 1762 ("[N]o single factor . . . automatically will satisfy Rule 23(a)(1). Rather, all factors will be considered by the court in determining whether impracticability exists. . . . [S]ince the question whether Rule 23(a)(1) has been satisfied depends on the facts of each case, the trial court's decision represents an exercise of discretion[.]" (footnotes omitted)); 5 James Wm. Moore,

14

plaintiffs is more likely to have a strong impracticability argument under some factors than a putative class with a small number of plaintiffs. The precise size of the putative class, standing alone, is not dispositive; rather the core question is whether "joinder of all members is impracticable." RCFC 23(a)(1).[19]

To what extent any of those concerns make sense in the context of an opt-in class action process remains to be seen — a subject the Court tackles in more detail below. Impracticability of joinder itself is arguably a nonsensical question in an opt-in class action, which may be viewed as nothing more than a permissive joinder procedure. *See Amchem Prods., Inc.*, 521 U.S. at 615 (explaining that "Rule 23(b)(3) 'opt-out' class actions superseded the former 'spurious' class action, so characterized because it generally functioned as a permissive joinder ('opt-in') device").[20] Indeed, some numerosity considerations that may apply to class certifications under FRCP 23 clearly should carry less weight or are virtually irrelevant to class certifications in this Court. For example, some courts, "[f]or purposes of establishing numerosity," have viewed "smaller classes [as] more readily certified when the relief sought is injunctive relief[.]" *Young v. Pierce*, 544 F. Supp. 1010, 1028 (E.D. Tex. 1982) (reasoning that the benefits of such relief "would inure not only to the known class, but also to a future class of indefinite size"); *see also, e.g.*, *Jackson v. Danberg*, 240 F.R.D. 145, 147–48 (D. Del. 2007) ("[T]he numerosity requirement has been relaxed in cases like this where injunctive and declaratory relief is sought by the class."); *Modafinil*, 837 F.3d at 253. That makes sense for an opt-out class where, "[p]roperly considered, the plaintiff class [includes] . . . unknown future class members." *Young*, 544 F. Supp. at 1028.[21] In such a case, "[o]f course, joinder of such persons is inherently impracticable." *Id.* at 1028–29. In this Court, however, that consideration makes littles sense because, generally, the available relief is monetary, not injunctive, and the class members must opt in.[22] Similarly, plaintiffs' geographic

---

*Moore's Federal Practice* § 23:22 (3d ed. 2022) [hereinafter 5 Moore] ("Whether joinder of all class members would be 'impracticable' has no fixed measuring criteria[.]").

[19] *See, e.g.*, 1 Rubenstein § 3:11–12 ("[T]he Rule's core requirement [in FRCP 23(a)(1)] is that joinder be impracticable. . . . [I]t is impossible to predict with certainty a 'magic number' that will satisfy the Rule 23(a)(1) prerequisite in every case."); 7A Wright § 1762 ("[C]aution should be exercised in relying on a case as a precedent simply because it involves a class of a particular size. A variety of factors . . . may contribute to the court's decision under Rule 23(a)(1)[.]").

[20] The Court addresses this point *infra*, Section IV.B.

[21] *See also* 5 Moore § 23.22[f] ("Class-action plaintiffs seeking injunctive or declaratory relief frequently seek to define a class to include people who might be injured in the future. . . . [or request a relief that] would benefit people not included in the class[.]").

[22] On the other hand, even in district court where plaintiffs may seek injunctive relief, that does *not* mean that plaintiffs "will have an *easier* time satisfying Rule 23(a)(1) than plaintiffs seeking monetary damages." *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 486–87 (3d Cir. 2018). To the contrary, "[w]hether a plaintiff seeks injunctive or monetary relief, [the] Rule 23(a)(1) burden remains the same." *Id.* Thus, "*Modafinil* simply . . . suggests that when a court is

dispersion (*i.e.*, their distance from the court) seems irrelevant for the Court of Federal Claims, which is one of just a few National Courts — so called because of their nationwide jurisdiction.[23]  Indeed, "[t]his Court has nationwide jurisdiction to hear cases and find facts anywhere in the United States."  *Marine Indus. Constr., LLC v. United States*, 2021 WL 3619919, at *4 (Fed. Cl. July 23, 2021) (citing 28 U.S.C. § 173); *see also* 28 U.S.C. §§ 798(a), 2505 ("Any judge of the United States Court of Federal Claims may sit at any place within the United States to take evidence and enter judgment.").

While the "numerosity requirement" necessitates "that there be a legally definable class that can be ascertained through reasonable effort[,] . . . the fact that plaintiffs do not know the exact number of class members does not preclude the granting of class status."  *Jones*, 118 Fed. Cl. at 733 n.2 (2014) (citing cases).[24]  Several judges of this Court have held that "[t]he number of potential class members is considered to be the most important factor of the numerosity requirement."  *Common Ground Healthcare*, 137 Fed. Cl. at 638 (citing cases); *Brown v. United States*, 126 Fed. Cl. 571, 578 n.3 (2016) (indicating that the Court of Federal Claims has found potential class sizes of 23, 25, 135, 150, and 152

---

determining whether [plaintiffs] ha[ve] satisfied [their] burden of establishing whether joinder would be impracticable, the type of relief sought . . . may be one factor that a court takes into consideration" but "[i]t will always be up to the [trial] court to explain how the form of relief has impacted its analysis."  *Id.*

[23] *Charlson Realty Co. v. United States*, 384 F.2d 434, 445 (Ct. Cl. 1967) ("The Court of Claims is a national court and receives petitions from all parts of the country."); *King v. United States*, 27 Ct. Cl. 529, 537 (1892) (explaining that "the Court of Claims . . . is not a local but a national court with jurisdiction throughout the United States").  The National Courts also include our appellate tribunal (the Federal Circuit) as well as the Court of International Trade ("CIT").  *See, e.g., South Corp. v. United States*, 690 F.2d 1368, 1371 (Fed. Cir. 1982) ("As a court of nationwide geographic jurisdiction, created and chartered with the hope and intent that stability and uniformity would be achieved in all fields of law within its substantive jurisdiction, we begin by adopting as a basic foundation the jurisprudence of the two national courts which served not only as our predecessors, but as outstanding contributors to the administration of justice for a combined total of 199 years, the Court of Claims and the Court of Customs and Patent Appeals."); *Rhone Poulenc, Inc. v. United States,* 880 F.2d 401, 402 (Fed. Cir. 1989) (noting that the CIT "is a national court under Article III of the Constitution").

[24] *But see* Scott Dodson, *An Opt-in Option for Class Actions*, 115 Mich. L. Rev. 171, 191–92 (2016) ("In the past, numerosity has not generally been a difficult criterion to satisfy. . . . But in today's age of stringent attention to the certification requirements, including the Supreme Court's admonition that the class must offer 'significant proof' of compliance, a number of courts have required proof of numerosity beyond what common sense might otherwise suggest." (footnotes omitted) (quoting *Dukes*, 564 U.S. at 353)); *Mielo*, 897 F.3d at 484 ("In recent years the numerosity requirement has been given 'real teeth.'" (quoting Robert H. Klonoff, *The Decline of Class Actions*, 90 Wash. U. L. Rev. 729, 768 (2013))).

members sufficient to satisfy the numerosity requirement).[25]   As indicated above, however, the count of putative class plaintiffs does not determine *per se* whether the proposed class checks the RCFC 23(a)(1) box. *Fewlass*, 83 F.R.D. at 165 ("The question of whether joinder is impracticable is not strictly one of numbers[.]").  Rather, the count of potential class members speaks to the practicability of joining all of them.

## 2.  Commonality [RCFC 23(a)(2)] and Predominance [RCFC 23(b)(3)]

As in *Dukes*, the true "crux of this case is commonality — the rule requiring a plaintiff to show that 'there are questions of law or fact common to the class.'" 564 U.S. at 349 (quoting FRCP Rule 23(a)(2)).  "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury'" such that the resulting claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution." *Id.* at 349–50 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)).   A common contention is capable of classwide resolution where "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

Putative class members' claims could have similarities but nevertheless fail to qualify for class certification because they do not identify a central question that is resolvable in one stroke.  "[M]erely . . . suffer[ing] a violation of the same provision of law" or "[r]eciting [common] questions is not sufficient." *Dukes*, 564 U.S. at 349–50.  For example, Title VII of the Civil Rights Act[26] "can be violated in many ways" and, thus, "[q]uite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once." *Id.*; *see Lohmann*, 154 Fed. Cl. at 369 ("Merely alleging that proposed class members 'have all suffered a violation of the same provision of law,' however, is not sufficient." (quoting *Dukes*, 564 U.S. at 350)).

*Dukes* instructs that this Court must look beyond the assertions in the class motion to see whether class action adjudication will provide a common answer to a central, common question.  In *Dukes*, the Supreme Court recognized that "proof of commonality necessarily overlaps with respondents' merits contention that Wal–Mart engages in a *pattern or practice* of discrimination."  564 U.S. at 352.  That was the case "because, in resolving an individual's Title VII claim, the crux of the inquiry is 'the reason for a

---

[25] *See also* 5 Moore § 23.22[b] ("[T]he most important factor is the absolute size of the proposed class . . . . [A large class size] may, by itself, establish that joining all class members would be impracticable."); 7A Wright § 1762; *cf.* 1 Rubenstein § 3:12 ("[A] class of 40 or more members raises a presumption of impracticability of joinder[.]").

[26] Civil Rights Act of 1964, Pub. L. No. 88-352, tit. VII, 78 Stat. 241, 253–66 (codified as amended at 42 U.S.C. § 2000e *et seq.*).

particular employment decision[.]'" *Id.* (quoting *Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 876 (1984)). Because "respondents wish[ed] to sue about literally millions of employment decisions at once," the Supreme Court concluded that they were required to demonstrate "some glue holding the alleged reasons for all those decisions together." *Id.* Otherwise, "it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id.*[27] The *Dukes* respondents pointed to just a single "corporate policy," but that policy established only that Wal-Mart "allow[ed] discretion by local supervisors over employment matters" — which, "[o]n its face, of course, . . . is just the opposite of a uniform employment practice that would provide the commonality needed for a class action[.]" *Dukes*, 564 U.S. at 355 (emphasis omitted) (concluding that the policy was one "against having uniform employment practices" (emphasis omitted)).

Thus, "[w]hat matters to class certification . . . is not the raising of common 'questions' — even in droves — but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Dukes*, 564 U.S. at 350 (second alteration in original) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)); *see also, e.g.*, *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 608–09 (7th Cir. 2021) (noting a workplace was not "homogenous," so the need to examine where each plaintiff worked meant employer liability was not a common question). In other words, "[c]ommonality requires that a proposed class action presents a common question that is capable of a common legal answer." *Monk v. Wilkie*, 978 F.3d 1273, 1277 (Fed. Cir. 2020) (emphasis omitted). At the class certification stage, a court need not decide what the common answer is, but the movant(s) must show that a common answer is possible. *See Dukes*, 564 U.S. at 359.[28]

On top of RCFC 23(a)(2)'s requirement for a common answer to a common question, RCFC 23(b)(3) requires the Court to look across the full set of material questions the proposed class action raises to determine whether the common issues predominate. Thus, pursuant to RCFC 23(b)(3), the Court must "find[] that the questions of law or fact *common* to class members *predominate* over any questions affecting only individual

---

[27] *See also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Merits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." (citing *Dukes*, 564 U.S. at 351 n.6)).

[28] After *Dukes*, some courts have continued to certify a class so long as there is "[e]ven a single [common] question," *see* 1 Rubenstein § 3:20 (alterations in original) (quoting *Dukes*, 564 U.S. at 359), but that part of the opinion was quoting and responding to a comment from the dissent, *see Dukes*, 564 U.S. at 359 (quoting 564 U.S. at 376 n.9 (Ginsburg, J., dissenting)).

members" (emphasis added).   Senior Judge Firestone succinctly explained the predominance requirement as follows:

> The Supreme Court . . . has established the standards to be applied in determining whether common questions predominate.  In *Comcast Corp. v. Behrend*, the Court held that in order to establish that common questions of law or fact predominate over individual questions, a party must show "that damages are capable of measurement on a classwide basis."  Otherwise, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."  In *Tyson Foods, Inc. v. Bouaphakeo*, the Supreme Court explained that "the predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."

*Colonial Chevrolet Co. v. United States*, 2016 WL 11641741, at *3 (Fed. Cl. Apr. 6, 2016) (citations omitted) (first quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34–35 (2013); and then quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 452–53 (2016)); *see also Amchem Prods.*, 521 U.S. at 623 & n.18 (explaining that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation").

In performing a predominance analysis, courts must "give careful scrutiny to the relation between common and individual questions in a case."  *Tyson Foods*, 577 U.S. at 453; *see also Amgen*, 568 U.S. at 467–68 (noting that the requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class"). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member[.]"  *Tyson Foods*, 577 U.S. at 453 (internal quotation marks omitted); *see also Sellers v. Rushmore Loan Mgmt. Servs., LLC*, 941 F.3d 1031, 1040 (11th Cir. 2019) ("[C]ertification is inappropriate when 'after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individualized claims.'" (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004), *abrogated on other grounds by Cherry v. Dometic Corp.*, 983 F.3d 1296 (11th Cir. 2021))).

The predominance consideration "is a qualitative rather than a quantitative concept" and "[i]t is not determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance."  *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014).  "If resolving a common issue will not greatly simplify the litigation to judgment or settlement of claims of hundred [sic] or thousands of claimants, the complications, the unwieldiness, the

delay, and the danger that class treatment would expose the defendant or defendants to settlement-forcing risk are not costs worth incurring." *Parko*, 739 F.3d at 1085.

Although the predominance requirement is found in RCFC 23(b), the issue is tightly correlated with the commonality issue of RCFC 23(a)(2) as noted above.[29]  Indeed, the commonality requirement may be viewed as "subsumed by the predominance requirement." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir. 2008) (internal quotation marks omitted); *see also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) ("We have previously noted that the Rule 23(b)(3) predominance requirement, which is far more demanding, incorporates the Rule 23(a) commonality requirement."); *Parko*, 739 F.3d at 1085 ("Predominance of issues common to all class members, like the other requirements for certification of a suit as a class action, goes to the efficiency of a class action as an alternative to individual suits.").  Even if this Court does not go so far as to say predominance swallows commonality, "[t]he commonality and predominance requirements are closely linked[,]" . . . [and] the Rule 23(b)(3) predominance requirement is 'far more demanding than the commonality requirement' found in Rule 23(a)." *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019) (internal quotation marks omitted) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)); *see also Comcast Corp.*, 569 U.S. at 34 ("If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." (citing *Amchem Prods.*, 521 U.S. at 623–24)).  That means, of course, that "[i]f the commonality requirement cannot be met, then the more stringent predominance requirement obviously cannot be met either." *Ferreras*, 946 F.3d at 185 (citing *Amchem Prods.*, 521 U.S. at 623–24).

### 3.   Typicality [RCFC 23(a)(3)] & Adequacy [RCFC 23(a)(4)]

While the above-discussed class certification requirements examine the putative class and its claims as a whole, the typicality and adequacy requirements instead focus on the proposed representative parties and their claims.[30]   A failure to satisfy commonality, for example, suggests the proposed class has a fundamental defect likely rooted in the nature of the claims and their required proof.  Failure to satisfy typicality or adequacy, in some circumstances, may mean only that a proposed class needs to revise its selected representatives.  Nevertheless, satisfying commonality will likely dispose of the typicality requirement as well.  And, if a proposed class satisfies commonality (*i.e.*, the link across putative class members) and typicality (*i.e.*, the link between proposed class representatives and putative class members), then the proponents of the class probably satisfy adequacy.  The Supreme Court has explained the close relationship between commonality, typicality, and adequacy:

---

[29] *See supra* note 8.

[30] RCFC 23(a)(3)–(4) (requiring that "the claims or defenses of *the representative parties* are typical . . . of the class . . . and *the representative parties* will fairly and adequately protect the interests of the class" (emphasis added)); 1 Rubenstein § 3:18.

> The commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.  Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

*Dukes*, 564 U.S. 350 n.5 (quoting *Falcon*, 457 U.S. at 157–158 n.13); *see also In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 852–53 (6th Cir. 2013) ("Th[e] [typicality] requirement insures [sic] that the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members.").

A typicality analysis therefore resembles a commonality analysis except with a focus on the representative parties.  The claims of the representative and class members must "aris[e] from the same governmental action and [be] premised upon a common theory of recovery."  *Geneva Rock Prods., Inc. v. United States*, 100 Fed. Cl. 778, 790 (2011) (named plaintiff's claim had the same "essential characteristics" as class members' claims because both the named plaintiff and other class members owned property affected by the government's notice and both alleged that the notice effected a taking of their property); *see also Y&J Props., Ltd. v. United States*, 134 Fed. Cl. 465, 468 (2017) ("The key to the typicality element is whether all class members are challenging the same conduct and relying on the same legal theories.").  While "typicality does not require identicalness of claims," *Lohmann*, 154 Fed. Cl. at 371 (citing *Barnes*, 68 Fed. Cl. at 498), it does require that "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Lohmann*, 154 Fed. Cl. at 371 (quoting *Gross v. United States*, 106 Fed. Cl. 369, 381 (2012)).

The adequacy requirement continues the class certification inquiry into whether "the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate."  *Dukes*, 564 U.S. at 349.  RCFC 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Thus, a "class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."  *Amchem Prods.*, 521 U.S. at 625–26 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977), and discussing FRCP 23(a)(4) specifically).  The "adequacy inquiry" then has the purpose of "uncover[ing] conflicts of interest between named parties and the class they seek to represent."  *Id.* (citing *Falcon*, 457 U.S. at 157–158, n.13).  Adequacy of representation is measured by two standards.  *In re Drexel*

*Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992).  "First, class counsel must be 'qualified, experienced and generally able' to conduct the litigation.  Second, the class members must not have interests that are 'antagonistic' to one another."  *Id.* (quoting *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968)); *see also In re Upstream Addicks & Barker*, 157 Fed. Cl. at 200 ("Adequacy asks both whether proposed class counsel is qualified and capable of representing the class and whether conflicts exist between the putative class representatives and the remaining class members." (citing *Geneva Rock Prods.*, 100 Fed. Cl. at 790)).[31]

As with numerosity, RCFC's typicality and adequacy requirements do not translate well from the parallel FRCP requirements.  In particular, the opt-in nature of this Court's class actions means the protection of, and fairness to, absent class members is not a concern for the obvious reason that absent class members are not bound by any judgment.  *Silver Buckle Mines*, 132 Fed. Cl. at 101 ("It is well settled that in an opt-in class action, only those parties who affirmatively choose to join the class are bound by the outcome.  Accordingly, a party that chooses not to participate in a class action in the Court of Federal Claims does not lose any legal rights as a result of that decision; whatever happens in the class action has no bearing on parties who do not participate." (citations omitted)).  This Court still must consider, however, alongside the other requirements, "whether the representative plaintiff's claim is typical of the putative class members' claims."  *Horvath*, 149 Fed. Cl. at 749 (citing *Curry*, 81 Fed. Cl. at 335–36).

### 4.  Superiority [RCFC 23(b)(3)]

"In the superiority analysis, a court determines whether a class action is the best vehicle for the litigation of the plaintiffs' claims."  *Cole v. Gene by Gene, Ltd.*, 322 F.R.D. 500, 507–08 (D. Alaska 2017), *aff'd*, 735 F. App'x 368 (9th Cir. 2018).  RCFC 23(b)(3) directs us to evaluate the following factors:  (1) "the class members' interests in individually controlling the prosecution of separate actions," RCFC 23(b)(3)(A); (2) "the extent and nature of any [already-pending] litigation concerning the controversy," RCFC 23(b)(3)(B); and (3) "the likely difficulties in managing a class action," RCFC 23(b)(3)(D).[32]

---

[31] In truth, "commonality and typicality tend to merge with the requirement of adequate representation, although the latter factor also brings into play any concerns about the competency of class counsel and any conflicts of interest that may exist."  *In re Whirlpool*, 722 F.3d at 852–53 (citing *Dukes*, 131 S. Ct. at 2551 n.5); *cf.* Dodson, *supra* note 24, at 193 ("[O]pt-in membership is itself sufficiently probative that adequacy generally should be more easily satisfied in an opt-in class[.]").  The Court has no concerns with proposed class counsel and no party has identified any potential conflicts of interest.

[32] The Supreme Court has instructed that these factors should be employed for both "the predominance and superiority criteria."  *Amchem Prods.*, 521 U.S. at 613–16.

The United States Court of Appeals for the Sixth Circuit has helpfully explained the superiority inquiry as follows:

> To determine whether a class action is the superior method for fair and efficient adjudication, the district court should consider the difficulties of managing a class action. The district court should also compare other means of disposing of the suit to determine if a class action is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action . . . . Additionally, the court should consider the value of individual damage awards, as small awards weigh in favor of class suits.

*Pipefitters Loc. 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 630–31 (6th Cir. 2011) (citations and internal quotation marks omitted); *see also In re Whirlpool*, 722 F.3d at 861 ("Use of the class method is warranted particularly because class members are not likely to file individual actions — the cost of litigation would dwarf any potential recovery."). Courts also consider, of course, the non-exhaustive factors set forth in Rule 23(b)(3) itself. *Colonial Chevrolet Co.*, 2016 WL 11641741, at *5 (citing RCFC 23(b)(3)(A)–(D)); *Amchem Prods.*, 521 U.S. at 615–16.

Where "issues of causation and damages are highly individualized," a case "would not be well-served by a class action." *Robertson v. Monsanto Co.*, 287 F. App'x 354, 362 (5th Cir. 2008) (per curiam). The question of damages may make a case particularly "ill-suited for class-wide adjudication." *Id.* In *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006), for example, the United States Court of Appeals for the Fifth Circuit explained that damages claims arising out of a single incident were nevertheless not well-suited for a class action where such damages were "not subject to any sort of formulaic calculation[,]" since "each individual plaintiff suffered different alleged periods and magnitudes of exposure and suffered different alleged symptoms as a result." Where "each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'" *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001) (finding "formidable complexities . . . inherent in" the case's claims meant the plaintiff did not "persuade" the Court of class action's superiority); *see, e.g.*, *Schmidtberger v. W. Refin. Retail, LLC*, 2021 WL 5024714, at *27 (C.D. Cal. Sept. 28, 2021) (rejecting certification in part because "the class members would be required to 'establish the reason for their missed breaks' and would 'face the inevitable delay imposed by waiting for the resolution of [possibly] thousands of individual factual claims in the class action'" (alteration in original) (quoting *Brown v. Fed. Express*, 249 F.R.D. 580, 587–88 (C.D. Cal. 2008))); *Vargas v. Quest Diagnostics Clinical Labs.*, 2021 WL 5989958, at *10 (C.D. Cal. Dec. 2, 2021).

IV.    DISCUSSION — THE COURT DENIES PLAINTIFFS' MOTION TO CERTIFY
       THE PROPOSED CLASS

To resolve the pending class certification motion, this Court primarily focuses on the RCFC 23 requirements of commonality, predominance, and typicality.[33]  The Court then considers superiority and numerosity, particularly with regard to how those class certification requirements apply in the context of an opt-in class action.  In analyzing the class certification requirements as applied to the claims and facts in this case, this Court follows the *Dukes* "rigorous analysis" standard.

Plaintiffs contend — citing *Barnes,* 68 Fed. Cl. at 495 — that "the trial court must assume the truth of the factual allegations in the Complaint" for the purposes of their class certification motion and RCFC 23.  Pl. Mot. at 17; *see also* Pl. Reply at 3–4 ("[T]his Court should assume the truth of the facts alleged in the complaint, and provided in Plaintiff's Motion[.]").  Plaintiffs are correct that, in *Barnes*, Judge Allegra wrote that in "apply[ing] the requirements of RCFC 23, . . . the court must assume the truth of the factual assertions contained in the complaint."  *Barnes*, 68 Fed. Cl. at 495 (citing *E. Tex. Motor Freight*, 431 U.S. at 405–06).  The undersigned is unsure of what, precisely, Judge Allegra meant, as *East Texas Motor Freight* does not appear to express such a view.[34]  In any event, the Supreme Court has thoroughly rejected the contention that a party seeking class certification is relieved of proving with record evidence that class certification is warranted:  "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Dukes*, 564 U.S. at 350–52 (quoting and discussing *Falcon*, 457 U.S. at 160–61); *see also Parko*, 739 F.3d at 1085 (holding that "[m]ere *assertion* by class counsel that common issues predominate is not enough" and that a court must receive and consider evidence before deciding class certification).  Following *Dukes*, this issue really isn't up for debate, as Plaintiffs all but conceded at oral argument.  Tr. 34:12–14 ("I think we have to provide evidence which demonstrates the preponderance of a class existing.").[35]

---

[33] Dodson, *supra* note 24, at 194 (explaining that "[o]pt-in classes do not inherently support" the commonality, predominance, or typicality requirements).

[34] *East Texas Motor Freight* concerned the presentation of evidence supporting class requirements during trial.  431 U.S. at 403.  The Supreme Court held that certification was not warranted based on the evidence.  *Id.* at 403–05 ("In short, the trial court proceedings made clear that [proposed class representatives] were not members of the class" and would not protect class interests.).  Moreover, the plaintiffs in that case had not even moved for class certification at trial, which was one of the central reasons the Supreme Court reached its conclusion.  *Id.* at 405.  *East Texas Motor Freight* has no bearing on the present case.

[35] *See, e.g., In re E.I. duPont de Nemours & Co. C-8 Personal Injury Litig.*, 2022 WL 4149090, at *6 (6th Cir. Sept. 9, 2022) ("[T]he Supreme Court has explained that certification requires a rigorous

### A.  Plaintiffs' Motion Fails to Demonstrate Commonality, Predominance, and Typicality

#### 1.  <u>Commonality</u>

Plaintiffs assert, as they must, that "there are . . . basic questions of law and fact that apply to the entire [putative] class."  Pl. Mot. at 20; *see also* Pl. Reply at 4.  According to Plaintiffs, the three basic questions are:   (1) "[w]hether the class member nurses performed their duties during their unpaid meal period"; (2) "[w]hether the VA induced nurse class members to perform these duties during their unpaid meal period *due to VA policies, patient health and safety concerns, and professional responsibility requirements*"; and (3) "[w]hether the VA failed to properly compensate class members under 38 U.S.C. § 7453."  Pl. Mot. at 20 (emphasis added); *see also* Pl. Reply at 4 (summarizing questions).  This decision refers to those questions, respectively, as Class Question 1, Class Question 2, and Class Question 3.[36]

To understand why Plaintiffs' motion is deficient, we must first understand the nature of not only Plaintiffs' claims for compensation, but also the evidence the parties

---

analysis to ensure that the requirements of Rule 23 are met, and that a party seeking to maintain a class action must satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." (cleaned up)); *Baker v. State Farm Mut. Auto. Ins. Co.*, 2022 WL 3452469, at *2 (11th Cir. Aug. 18, 2022) ("A court may only certify a class action if the moving party fulfills, via evidentiary proof, all the requirements set forth in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements under Rule 23(b)." (citing *Comcast Corp.*, 569 U.S. at 33)); *Kurtz v. Costco Wholesale Corp.*, 768 F. App'x 39, 40 (2d Cir. 2019) ("This requirement of proof applies to all requirements of Rule 23 — including the predominance requirement described above."); *Lohmann*, 154 Fed. Cl. at 361–62 (explaining that "Plaintiffs bear the burden of affirmatively establishing that the RCFC 23 requirements are 'in fact' met" and that "the Court must conduct a 'rigorous analysis' and may probe beyond the pleadings to assess Plaintiffs' showing" (emphasis omitted in original) (first citing *Dukes*, 564 U.S. at 350–51; and then citing *Fisher v. United States*, 69 Fed. Cl. 193, 197 (2006)).  Even Judge Allegra in *Barnes* acknowledged that "Plaintiffs bear the burden of establishing that the action satisfies the[ RCFC 23] requirements." *Barnes*, 68 Fed. Cl. at 495 (citing *Amchem Prods.*, 521 U.S. at 613–14); *see also Crawley v. United States*, 2021 WL 252838, at *3 (Fed. Cl. Jan. 25, 2021); *Mercier v. United States*, 138 Fed. Cl. 265, 270 (2018) ("The plaintiff bears the burden of establishing these requirements." (citing *Fisher*, 69 Fed. Cl. at 197)).

[36] Class Question 3 essentially summarizes, and is subsumed within, the first two questions together.  If nurses worked unpaid through their meal periods (Class Question 1), and they were induced to do so (Class Question 2), the resulting overtime may be compensable.  Then, by definition, the nurses may not have been paid properly (Class Question 3).  Accordingly, Class Question 3 depends entirely upon the resolution of Class Questions 1 and 2.  Because Class Question 3 does not add anything to the class certification discussion, this Court does not address it further.

summarize in their respective filings.[37]  *Dukes*, 564 U.S. at 351 ("rigorous analysis" of Rule 23 compliance "will entail some overlap with the merits of the plaintiff's underlying claim").

> a.   *For the Purposes of Plaintiffs' Pending Motion for Class Certification, this Court Assumes Mercier's Interpretation of 38 U.S.C. § 7453(e) Applies to Plaintiffs' Claims*

As explained *supra*, Plaintiffs claims are based on 38 U.S.C. § 7453(e), which provides overtime compensation for "[a] nurse performing *officially ordered or approved* hours of service in excess of 40 hours in an administrative workweek, or in excess of eight consecutive hours[.]" (emphasis added).  The Federal Circuit has held that overtime work is "officially ordered or approved" — and thus qualifies for compensation — where employees have been "induced" to work such overtime.  *Mercier*, 786 F.3d 981–82.  In 2017, however, after the Federal Circuit decided *Mercier*, the VA updated Handbook 5007 to provide that employees are authorized to work overtime only (1) "when the overtime has been approved either verbally or in writing, *in advance*, by an appropriate management official[,]" or (2) employees "submit a written request for after-the-fact authorization" for overtime.  VA Handbook 5007 pt. V, ch. 2 at V-3a (emphasis added) (providing that "the decision to authorize [after-the-fact] overtime is at the discretion of management").

Because Plaintiffs' proposed class includes nurses employed at the Northport Veterans Affairs Medical Center in Northport, New York, since November 5, 2013, a preliminary question for the proposed class's commonality analysis is whether Plaintiffs may ultimately support their claims with evidence of mere inducement, as per *Mercier*, or must Plaintiffs prove express approval, as per updated VA Handbook 5007.  For the purposes of the pending class certification motion and this Court's commonality analysis, we assume without deciding that the more permissive "inducement" standard from *Mercier* applies, notwithstanding that VA Handbook 5007 may be entitled to deference (at least for overtime claims since the relevant updates took effect).[38]

---

[37] *See* Pl. Mot. at 11–15 (purporting to summarize evidence that "[n]urses are [i]nduced to [w]ork [t]hrough their [u]npaid [m]eal [p]eriods" and that "[m]anagement is [a]ware that [n]urses" are doing so).

[38] *See, e.g.*, *Boyer v. United States*, 159 Fed. Cl. 387, 411 n.15 (2022) (discussing deference to VA handbooks and other informal guidance).  As discussed *supra*, the statute at issue in both *Mercier* and this case (38 U.S.C. § 7453) "does not require the official order or approval to be in any particular form," yet at the time *Mercier* was decided the VA had "not enacted any regulation interpreting the statute as mandating any particular procedure that must be followed to qualify for overtime pay."  *Mercier*, 786 F.3d at 972 & n.1 (explaining that "[t]he handbook is an informal agency interpretation and is entitled to deference only 'proportional to [its] power to persuade.'"

As discussed below, however, Plaintiffs' evidence does not demonstrate that even bare inducement is resolvable on a classwide basis.  Moreover, regardless of the proper test for compensable overtime pursuant to 38 U.S.C. § 7453(e), Plaintiffs have not shown that any of the critical class certification questions Plaintiffs have posed are answerable on a classwide basis.  With respect to Class Question 1, there is no way to resolve on a classwide basis whether an individual nurse worked overtime at all.  And, even if that were not the case, questions of damages — how long each nurse worked overtime — would overwhelm any common question.  Similarly, Class Question 2 litigation (*i.e.*, to answer whether the VA induced overtime work) will require overwhelmingly individualized testimony from each opt-in plaintiff.  Such individualized evidence is so central to Class Question 2 that it is not a common question, let alone one that satisfies predominance; thus, class certification is not warranted pursuant to RCFC 23.

### b.  *Plaintiffs Lack a Commonly Answerable Central Question*

The devil is in the details of the evidentiary record.  Those details, examples of which are addressed below, demonstrate that Plaintiffs have not satisfied RCFC 23's commonality requirement that the class claims share a central issue that can be resolved all at once with a common answer.  *Dukes* 564 U.S. at 350 (holding that plaintiffs must show that their claims "depend upon a common contention" and "[t]hat common contention, moreover, must be of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue *that is central to the validity of each one of the claims* in one stroke" (emphasis added)).

Plaintiffs rely upon the depositions of the four proposed class representatives: Kim Macklin (*see* ECF No. 27-8 (deposition transcript) ("Macklin Tr.")); Nicholas Orlando (*see* ECF No. 27-10 (deposition transcript) ("Orlando Tr.")); Renee Lupo (*see* ECF No. 27-11 (deposition transcript) ("Lupo Tr.")); and Richard Walters (*see* ECF No. 27-13 (deposition transcript) ("Walters Tr.")).  *See* Pl. Mot. at 15–16 (describing "[p]roposed [c]lass [r]epresentatives").[39]  Accordingly, the Court focuses its attention primarily on those class representatives for the purposes of the pending motion.  The record evidence illustrates wide variation among the proposed class members, severely undercutting Plaintiffs' response to the government's commonality attack.

---

(internal quotation marks omitted) (quoting *Von Zemenszky*, 284 F.3d at 1319)).  That is no longer the case given the updates to VA Handbook 5007.

[39] Plaintiffs misspell "Macklin" as "Mackin."  *Compare* Pl. Mot. at 16 *with* Sec. Am. Compl. at 11; Macklin Tr. 1:10; ECF No. 27-16 at 21 (Plaintiffs' Exhibit P).  The government repeated this misspelling.  Def. Resp. at 1, 13.

**Class Question 1**

Each deposition includes a discussion of how frequently the representative nurse worked through meals.  Nurse Macklin testified that she "cannot provide any specific dates when [she] missed . . . meal periods," and "cannot provide the approximate amount of time or the percentages of time [of] any particular year when [she] missed . . . meal periods."  Macklin Tr. 6–12.  Nurses Lupo and Orlando were more definitive about how often they worked through a meal period, but their estimates differed.  Lupo Tr. 77:17–20, 79:2–5, 79:13–22, 80:1–22, 81:1–12 ("Four out of my five shifts I would say on average. . . . Because again, I don't have a set schedule, so I have to write down my schedule.  But no, I don't have any of those calendars [before December 2020.]"); Orlando Tr. 14:10–18 ("I can't quantify [the instances of work performed during ostensible meal breaks].  You're talking eight years of time. . . . [T]wo times per week and four weeks in a month, so eight times per month, at least.").  Nurse Walters testified that his lunch breaks are "constantly interrupted."  Walters Tr. 37:1–22, 42:4–7, 45:15–18 (explaining that "[t]here is a rare day that somebody does not interrupt your lunch" and "about 50 percent of the time [he] get[s] interrupted during [his] lunch break" but that the facts and circumstances of such interruptions vary).

The following colloquy during oral argument illustrates Plaintiffs' evidentiary problem:

> THE COURT:  . . . You have the burden to show that [Plaintiffs] worked through their lunch break.  You are going to have to show that for each individual opt-in member, aren't you?
>
> [PLAINTIFFS' COUNSEL]:  Eventually, *yes,* but this Court can make broad-brush determinations that allow us to ease those inquiries.

Tr. 40:23–25, 41:1–3 (emphasis added).  What this Court is looking for, however, is *evidence* that we "can make broad-brush determinations" that actually answer the critical class questions Plaintiffs identify in their motion, *see* Pl. Mot. at 20.  What Plaintiffs appear to admit here is that there is no avoiding a plethora of individual inquiries for each opt-in plaintiff, including for Class Question 1.[40]

---

[40] Nor, for that matter, can Plaintiffs avoid individualized proof to determine the length of any uncompensated work during meal breaks.  Def. Resp. at 21; *see also Comcast Corp.*, 569 U.S. at 34 ("Questions of individual damage calculations will inevitably overwhelm questions common to the class."); *Saunooke v. United States*, 8 Cl. Ct. 327, 330–31 (1985) (concluding that a tax refund case "is particularly ill-suited for class certification" where, "[t]o prevail each individual must not only establish the error in his particular assessment, but also the correct amount of taxes" and that given "the burden of proof in the court with respect to damages, it is virtually impossible in a class action to achieve the individualized results demanded").

**Class Question 2**

Even if the evidence were capable of answering Class Question 1, that would not answer Class Question 2, which is the class certification question at the core of Plaintiffs' claims against the VA: "whether the VA *induced* such work," Pl. Reply at 4 (emphasis added).  Put differently, the central, and more difficult, question here is not *whether* a particular nurse worked through a meal period without compensation, but rather *why* a nurse did so.  Moreover, in terms of class certification, as noted *supra*, "[w]hat matters to class certification . . . is not the raising of common 'questions' — even in droves — but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Dukes*, 564 U.S. at 350 (second alteration in original) (quoting Nagareda, *supra* text accompanying note 28, at 132).  Although the Court searched the record for indications that Plaintiffs' reasons for mealtime work are capable of common answers, there are few, if any, such signs to be found.  Indeed, the section of Plaintiffs' motion discussing commonality, Pl. Mot. at 20–21, does not span even two pages, does not begin to suggest possible common answers to the common questions posed, and certainly does not proffer specific evidence in support of such answers that withstand a "rigorous analysis," *Dukes*, 564 U.S. at 351.

The question of *why* Plaintiffs allegedly worked overtime is the crux of their compensation claims.  In that regard, even assuming (for now) that Plaintiffs are correct that *Mercier*'s more lenient "inducement" standard applies to their overtime claims, the Court again notes that management's mere knowledge or awareness of employees' working through unpaid breaks is insufficient.  *Mercier*, 786 F.3d at 981 (citing *Bilello*, 174 Ct. Cl. at 1257).  Senior Judge Bruggink helpfully elucidated this point in a recent decision:

> To constitute order or approval by inducement, however, an employer must have more than "mere knowledge" that an employee is working overtime hours.  An employer's "tacit expectation" that employees work overtime is similarly insufficient to constitute inducement. Where courts have found more than a "tacit expectation," employers either expressly communicated their expectation of extended hours, scheduled additional hours of work outside of the regular workweek, or issued *rules* and regulations that had the "practical effect" of requiring overtime hours. These requirements reflect the fact that [the] "ordered or approved" standard provides for narrower coverage than the "suffer or permit" standard of overtime under the FLSA.

*Coyner v. United States*, -- Fed. Cl. --, 2022 WL 4008086, at *5 (Fed. Cl. Sept. 2, 2022) (citations omitted); *see also Mercier*, 786 F.3d at 974 ("Where there was 'more than only a tacit expectation' but less than an express directive to work overtime, the court asked

whether the overtime was 'induced.'" (internal quotation marks omitted) (quoting *Baylor v. United States*, 198 Ct. Cl. 331, 359–60 (1972))).

With that in mind, the Court concludes that most of the evidence upon which Plaintiffs rely is not remotely probative of inducement, nor does it demonstrate that the inducement question is answerable in one stroke for the entire class.

The reasons nurses proffered for their mealtime work varied widely.  Consistent with Plaintiffs' central contention in support of their class certification motion, Mr. Orlando and Mr. Walters appeared to blame missed breaks on staffing levels. Orlando Tr. 18:21–22, 19:1; Walters Tr. 76:18–22, 97:1–11 ("There have been instances over the past years where we have been told that we could not leave the hospital because they were short staffed.").  But mere "instances over the past years" hardly provides evidence for a common practice or policy supporting the existence of a class.  Walters Tr. 97:1–11. Mr. Orlando also pointed generically to "the culture" of any hospital, Orlando Tr. 23:7–18, but he testified that various staffing issues are responsible for his not taking meal breaks, *see* Orlando Tr. 23:16–22, 24:1.

Nurse Lupo was even more equivocal, testifying that she sometimes does not take her full break because she "feel[s] guilty" but that "no one[]" is "telling [her] that [she] ha[s] to get up and help patients" or "cannot take more than a 15-minute break or lunch break." Lupo Tr. 40:14–15; 41:8–13.  Indeed, Ms. Lupo expressly admitted that she works through her breaks because she "feel[s] like [she is] burdening the other nurses" and that her reasons for working through the breaks are varied.  Lupo Tr. 41:13–14, 21–22 ("There are so many situations.").  Again, the fact that Ms. Lupo was sometimes "the only RN" on duty and did not take a break — because, in that case, she "physically cannot leave the unit" — is not sufficient to support class certification.  Lupo Tr. 77:4–16.  Put more generally, the fact that staffing levels, on occasion, may have contributed to a nurse's having worked through a meal break would still require each and every plaintiff to testify about the particular working conditions giving rise to a claimed overtime period.

There is also variability in how Plaintiffs responded to working through meals. While Mr. Orlando "understood that [he] can get overtime for missed meal periods," he rarely requested overtime and suggested that it was not induced.  Orlando Tr. 15–22 (testifying that despite having worked several times per month during meal periods since 2014, he "only requested overtime just 20 times" because "[i]t's just what we do"). Mr. Walters, meanwhile, testified that he "would not stay unless [he] was paid overtime" and believes he was paid.  Walters Tr. 76:17–22, 77:1.  Thus, Mr. Walters may not even be within the proposed class.

Accordingly, even among the proposed class representatives, the testimony varies regarding everything from whether a particular nurse worked through an unpaid break or why other nurses may have done so.  Where "[r]esolution of one [p]laintiff's claim will

not impact the others' claims," the "claims lack commonality and the Court must deny class certification." *Varnes v. Home Depot USA, Inc.*, 2014 WL 12622462, *4 (M.D. Fl. July 11, 2014). As was the case in *Varnes*, Plaintiffs' claims here "require individual and independent evaluations of the circumstances surrounding each alleged incidence." *Id.; see also Former Emps. of IBM Corp. v. Chao*, 292 Fed. App'x 902, 908–09 (Fed. Cir. 2008) (affirming denial of class certification where "evidence presented by Appellants fails to support a finding of commonality" even where they claimed "that all potential class members are subject to the same overarching legal issue"); *Lohmann*, 154 Fed. Cl. at 370 (denying class certification where plaintiffs' claims would "likely require" a host of "individualized assessment[s]"). Contrary to Plaintiffs' counsel's assertion, there simply is no classwide evidence (even amongst the proposed representative plaintiffs) that employees are "working overtime because, if they don't, patients are going to die." Tr. 11:4–8.

Testimony from yet other putative class members — *i.e.*, those *not* designated as proposed class representatives — is even more all over the map. *See* Def. Resp. at 16–17 (describing deposition testimony). The Court agrees with the government that such testimony "highlights the tremendous variation in the circumstances and frequency with which [employees] experience missed or interrupted meal breaks" and, in other cases, "demonstrates inherent inconsistencies between the class members' claims, or lack thereof." *Id.* at 16. On this front, the Court fully credits the government's argument for two reasons: (1) the Court's independent review of the evidentiary record leads the Court to conclude that the government is correct; and (2) Plaintiffs' reply brief is utterly devoid of quite literally any response to the many pages of specific testimony the government's response brief marshaled in support of its position. Given Plaintiffs' failure to respond to the government's specific arguments and cited evidence, the Court has little choice but to the side with the government. *See, e.g., Seventh Dimension, LLC v. United States*, 161 Fed. Cl. 110, 129 (2022) ("Undeveloped or perfunctory arguments . . . may be deemed forfeited or waived."); *Aeling v. Saul*, 2020 WL 7768407, at *9 (D.N.J. Dec. 30, 2020) ("The Court will not hunt through the record to find evidence to support Plaintiff's position.").[41]

_____

[41] *See also Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 1379 n.2 (Fed. Cir. 2020) (noting that arguments made "in passing" are not considered fully developed and are waived), *cert. denied*, -- U.S. --, 142 S. Ct. 82 (2021); *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1341 (Fed. Cir. 2006) (concluding that undeveloped arguments are "deemed waived"); *Olaplex, Inc. v. L'Oréal USA, Inc.*, 855 F. App'x 701, 712 (Fed. Cir. 2021) ("If the record contains more evidence than [the court] ha[s] identified, [and the parties] ha[ve] not brought such additional evidence to [the court's] attention, [the court] need not sift the extensive record for it on [its] own."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' [is] really nothing more than an assertion, [and] does not preserve a claim[,] [e]specially not when the brief presents a passel of other arguments . . . . Judges are not like pigs, hunting for truffles buried in briefs." (citation omitted)); *DeJonghe v. City of Dearborn Heights*, 2021 WL 4894613, at *8 (E.D. Mich. Oct. 20, 2021) ("Because the Court cannot develop Plaintiff's arguments *sua sponte*, Plaintiff's challenge is waived.").

The bottom line is that the government is correct that "[t]o determine whether a particular nurse was induced to work [overtime] on a particular day" — and for how long — "the Court will be required to engage in[] an individual analysis" that "is not subject to classwide proof." Def. Resp. at 23 (citing *Cole v. CRST Van Expedited, Inc.*, 842 F. App'x 162, 163 (9th Cir. 2021)); *see also Monk*, 978 F.3d at 1277 (concurring "that the rule of 'commonality' requires that a proposed class action presents a common question that is capable of a common legal answer" (citing *Dukes*, 564 U.S. at 350–52)). Alleging non-conclusory facts supporting a finding of inducement may be sufficient to survive a motion to dismiss, as in *Mercier*, but it is not sufficient to meet the commonality test as the Supreme Court has explained it. That test requires Plaintiffs to support its motion with specific evidence, not mere allegations.

Plaintiffs' motion does not reconcile the disparate evidence and instead relies on allegations. Plaintiffs assert that their class certification motion should be granted based upon an assortment of contentions they argue are related to inducement:

- Nurses worked overtimed because "it's part of the culture in the ER and the hospital to provide the best patient care — *sometimes*, as a result of staffing levels";

- "[M]eal period breaks were rare when working on weekend shifts";

- "Many did not even know that they were entitled to be compensated for working through their meal periods";

- "Nurses . . . never or rarely asked for overtime pay or compensation for working through their unpaid meal periods."

Pl. Mot. at 12 (emphasis added) (citing record evidence); *see also, e.g., id.* at 14 ("Supervisors admitted that they had knowledge of nurses working through meal periods."). None of those assertions, however — even assuming the cited record evidence actually supports them — come close to suggesting any sort of classwide inducement pursuant to 38 U.S.C. § 7453(e) that explains *why* nurses worked during breaks.

Each of the above examples encounters a fatal stumbling block. The concession that staffing levels "sometimes" played a role in nurses working during unpaid breaks necessarily means that a case-by-case analysis of staffing levels will be required. The fact that "meal period breaks were rare" in certain instances only begs the question *whether* a particular nurse was induced to worked through the meal period in those specific instances. That is because the mere fact that a nurse (or many nurses) worked through a meal period does not shed any light on *why* such work occurred. Even if nurses were not informed of the circumstances that entitled them to overtime pay, that does not show *why*

they may have worked overtime in any particular case to begin with, nor does it show that they did so. The same is true for nurses who allegedly did not claim overtime pay after working during meal periods; indeed, a nurse might have not claimed overtime because it was not induced and, thus, not compensable.

The Court agrees that some of the Plaintiffs' other assertions may be relevant to a claim of induced overtime. For example, Plaintiffs point to evidence that some "nurses worked through their meal periods because the units were too busy and/or they could not obtain relief to cover their patient care or clinical duties." Pl. Mot. at 12 (citing record evidence). Similarly, "[m]any . . . Plaintiffs notified their supervisors that they *had* to work through their meal periods" but the managers would respond "too bad." *Id.* at 13 (emphasis added). Indeed, Plaintiffs all but concede that this specific type of alleged inducement (*i.e.*, that working conditions necessitated the overtime) — and not those catalogued above — represent the backbone of Plaintiffs' case:

> Plaintiffs claim that there was a widespread practice of nurses working through their unpaid meal periods *to provide patient care and perform clinical duties because the VA was understaffed*, units were busy and there was not a well-followed process to provide coverage to nurses so as to allow them to take their meal breaks.

Pl. Mot. at 21 (emphasis added) (summarizing theory of the case); *see also id.* at 22 ("[C]ommon to all class members, regardless of individual differences that may exist, is whether the nature of the work performed is such that a failure to perform the induced duties can result in possible patient harm, malpractice, and professional licensing and certification revocation.").

While Plaintiffs' working theory of inducement due to staffing levels generally makes sense, this Court agrees with the government that "[t]he proposed representatives' testimony was replete with vagueness, in that no plaintiff was able to identify when, how often, or for how long they performed work during their meal breaks" and that "their testimony contains tremendous variation in the circumstances and frequency with which they experience missed or interrupted meal breaks." Def. Resp. at 9; *see also id.* at 9–16 (summarizing deposition testimony). More significantly, the Court agrees with the government that "[t]he nurses testified to different reasons for working through his or her meal break." *Id.* at 22 (discussing deposition testimony). That means that each and every Plaintiff — whether a named representative, or of the opt-in variety — will have to prove entitlement to overtime based, at a minimum, on a totality of the circumstances (and, thus, different facts) to support a finding of inducement. The government is correct that "[t]o determine whether a particular nurse was induced to work [overtime] on a particular day, the Court will be required to engage in an individualized analysis" and "thus, this question is not subject to classwide proof." Def. Resp. at 23. Simply put, this

Court discerns no difference between the inducement claims here and the discrimination claims at issue in *Dukes* that failed the commonality requirement. 564 U.S. at 350.

Again, none of this is to say that Plaintiffs failed to provide *some* evidence that, *at least at times*, there were staffing shortages at the hospital in question. But although "Plaintiffs claim that there was a widespread practice of nurses working through their unpaid meal periods . . . because the VA was understaffed," Pl. Mot. at 21, Plaintiffs never explain how they will avoid having to show that each and every claimed period of overtime — for each and every opt-in plaintiff — was induced based on the particular working conditions. While evidence regarding staffing shortages may be consistent with — and, indeed, provide *support* for — a legal conclusion of inducement, evidence of understaffing does *not* translate to inducement *per se*. Such evidence of understaffing alone does not yield common answers sufficient for this Court to certify the proposed class. *Dukes*, 564 U.S. at 352. This Court agrees that "[a] question is not 'common to the class' merely because the same evidence is relevant" to different plaintiff's claims. *In re Lincoln Nat'l 2017 COI Rate Litig.*, -- F. Supp. 3d --, 2022 WL 4091426, at *10 (E.D. Pa. Aug. 9, 2022) (quoting *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 900–01 (3d Cir. 2022)). "Instead, evidence must be likely to 'produce a common answer.'" *Id.* (quoting *Allen*, 37 F.4d at 901).

To support a conclusion that understaffing induced uncompensated work, Plaintiffs must ultimately prove a link between a policy of understaffing and specific working conditions such that there is a demonstrable causal link from those working conditions to the performance of the claimed uncompensated work. Plaintiffs provided no such evidence or even an explanation for how that will be demonstrated. In the context of this case, for example, this Court has no difficulty imagining instances where a nurse does additional, productive work, but where it is neither medically nor even administratively necessary. Awarding overtime in such circumstances — *i.e.*, based solely on some broad, general finding about staffing shortages — would essentially eliminate the government's discretion regarding when to pay overtime (and to whom). Employees cannot be permitted to unilaterally decide when overtime should be paid by working overtime whenever they want merely because they believe it is somehow necessary. In other words, generalized evidence of understaffing is simply an insufficient basis upon which to sustain a class action in this case. Each case and period of claimed overtime will have to be examined individually, looking at the totality of the circumstances of the working conditions that allegedly induced the putative overtime.

Here is a thought experiment to illustrate the Court's point. Let's assume that, for a given nursing unit, there are 10 hours of productive work to be completed in a single day, but only one nurse is on staff working an eight-hour shift. The government has three choices: (1) hire another nurse to complete the two additional hours of work; (2) pay the staffed nurse overtime for two additional hours; or (3) accept that two hours of work will not be completed. Now, if that additional two hours of work is non-essential (*e.g.*,

paperwork that is not time-sensitive, tidying up) — or would merely be helpful to the next nurse on duty — it is obvious to the Court that the lone nurse on staff cannot force the government to pay overtime by voluntarily opting to perform the additional two hours of work and then claiming that the work was induced.  Even if the nurse admirably is just trying to be productive and helpful, and there is work to be done, that does not equate to inducement.

On the other hand, if the additional two hours of work may be the difference between life and death for a patient or if professional obligations were to require the nurse to remain at his or her station — *e.g.*, there is no nurse to take over the shift after eight hours — such understaffing may well constitute inducement.  That is particularly true where the additional work is performed with the full knowledge of management.  But what the Court's hypothetical demonstrates is that claims of induced overtime due to understaffing involve a fact-specific, totality-of-the-circumstances inquiry.  In other words, generalized understaffing does not translate *per se* into a viable overtime claim for any and all additional work performed by an employee.  Neither understaffing nor management knowledge — in isolation or combination — necessarily equates to inducement of overtime work.  *Coyner*, 2022 WL 4008086, at *5 (holding that "order or approval by inducement" requires "more than 'mere knowledge' that an employee is working overtime" and that "[a]n employer's 'tacit expectation' . . . is similarly insufficient").  In that regard, the undersigned agrees with Senior Judge Firestone that this Court should not find commonality where liability does not "turn[] on . . . [a] common factor" and where, as here, "[t]he proof related to [other liability] factors will vary for each plaintiff."  *Colonial Chevrolet Co.*, 2016 WL 11641741, at *5 (discussing commonality and predominance together).

The decision of the United States Court of Appeals for the Third Circuit in *Ferreras v. American Airlines, Inc.*, 946 F.3d 178, further illustrates why this Court rejects Plaintiffs' motion here.  In that case, employees of American Airlines alleged violations of "the New Jersey Wage and Hour Law . . . because the airline's timekeeping system defaults to paying employees based on their work schedules, even if they work additional hours outside of their shifts and in excess of 40 hours per week."  946 F.3d at 180.  The employees brought their claims as a putative class action and moved for class certification.  *Id.*  Although the district court determined that all of Rule 23's class certification requirements were met, the Third Circuit reversed, agreeing with the airline that the trial court "did not conduct a rigorous analysis and that several of the requirements of Rule 23, including commonality and predominance, were not met."  *Id.*  The appellate court agreed that the case could not "proceed as a class action because determining when each employee was actually working will necessarily require individualized inquiries."  *Id.*

In so holding, the Third Circuit described how the facts in *Ferreras* did not support a class action because commonality was not satisfied.  In particular, the court of appeals explained that "plaintiffs will still need to go through the process of proving that each

individual employee worked overtime and is thus entitled to additional compensation, regardless of any common evidence." *Ferreras*, 946 F.3d at 185–86 (explaining that "[e]ven if one of the [plaintiff] groups was affected by . . . [an overarching] policy, that would not drive the resolution of the litigation on a classwide basis").  The same sort of problems that plagued the class certification motion in *Ferreras* apply with equal, if not more, force to Plaintiffs' motion in this case because "whether each individual plaintiff was entitled to overtime that they did not receive" is not subject to a "common answer[]" but rather involves an "inquiry [that] mandates an individualized review of each particular class member to determine if overtime is due."  *Velasquez v. Digit. Page, Inc.*, 303 F.R.D. 435, 442–43 (E.D.N.Y. 2014); *see also Horvath*, 149 Fed. Cl. at 745–46 ("linking [pay] claims together in a class action requires that the underpayment be based on grounds generally applicable to all prospective class members"); *Gross*, 106 Fed. Cl. at 379 (holding that whether a proposed class of agency employees had a "common" question about Sunday premium pay depended on whether their entitlement to the pay could be proven by reference to "generalized proof" of Sunday hours worked or only by individualized inquiry into the Sunday-scheduling practices of each plaintiff's region and the type of Sunday work each plaintiff performed).[42]

Thus, Plaintiffs' case here is fundamentally different from one involving claims that turn, for example, on the proper classification of a specific group of employees as a matter of law.  Take a case where "Plaintiffs claim Defendants misclassified all survey crew members as independent contractors during a three-year period."  *Bradbury v. Transglobal Servs., LLC*, 2018 WL 3603078, at *4 (W.D. Tex. June 16, 2018).  In such a case, "[t]he questions addressed . . . are collective and not fundamentally personal — (1) the type of work performed by survey crew members; (2) the hours worked and compensation provided to survey crew members; and (3) Defendants' classification of the survey crew members as independent contractors."  *Id.*  In other words, a class action is appropriate where "[t]he fundamental inquiry is whether Plaintiffs show 'some identifiable facts or legal nexus [that] bind the claims so that hearing the cases together promotes judicial efficiency.'"  *Id.* (second alteration in original) (quoting *McKnight v. D.*

---

[42] *See also Custodio v. Frontera Produce Ltd.*, 2009 WL 10713875, at *3 (S.D. Tex. Dec. 29, 2009) ("Commonality also does not exist. . . . Here, the question of whether [defendant] required an employee to stay on-site 'off the clock' and effectively work without pay on any given occasion is unique to each plaintiff."); *Black v. United States*, 24 Cl. Ct. 471, 478 (1991) ("In this case, distinct individual determinations must be made regarding the degree of disability, type of disability, diagnosis by physicians and amount of compensation, if any, to be paid to each potential claimant.  Potential claimants would surely have been diagnosed at different time periods by different physicians for different reasons.  Thus, it is patently clear that the plaintiff's averments here lack the requisite and singular question of fact for class certification."); *Ray v. Motel 6 Operating, Ltd. P'ship*, 1996 WL 938231, at *4 (D. Minn. Mar. 18, 1996) ("The evidence does not indicate that all the Plaintiffs sustained injury from one unlawful [overtime] policy.").

*Hous., Inc.*, 756 F. Supp. 2d 794, 801 (S.D. Tex. 2010)).  Here, in contrast, the claims are "fundamentally personal," *id.*, and thus class certification is not warranted.

Plaintiffs' Second Amended Complaint itself provides yet further support for the Court's view that determining whether the VA induced nurses to work during meal breaks is not a common question across the proposed class for which there is a common evidentiary answer.  Plaintiffs allege that "Defendant's *knowledge of* the additional hours worked by Plaintiffs . . . on a recurring and *involuntary* basis . . . and Defendant's *expectation*, *requirement*, and inducement to work those additional hours[,] constitute Defendant's order or approval for the additional hours worked." Sec. Am. Compl. ¶ 253 (emphasis added).

The fact that Plaintiffs feel the need to blend vastly different concepts — *i.e.*, the agency's knowledge, expectation, and requirement — to support their overtime claims reflects the conundrum Plaintiffs face and the flaw in their pending motion.  As the settled law makes clear, knowledge does not equate to an order or approval.  Nor does the fact that a plaintiff may have worked overtime on a recurring basis permit the Court to infer inducement.  Nor does a government manager's expectation, standing alone, equate to inducement, order, or approval.  Rather, the critical words in the above-quoted allegation are "involuntary" and "requirement." Sec. Am. Compl. ¶ 253.  The Court agrees that "[i]nvoluntary" or "require[d]" overtime would answer the mail.  But, as the Court demonstrated above, staffing shortages alone — *i.e.*, without further context and explanation — cannot show that any particular alleged overtime work was "involuntary," "require[d]," or "induce[d]." *Id.*  As in *Dukes*, this Court concludes that "[a] similar failure of inference arises here." *Dukes*, 564 U.S. at 356; *see also In re Lincoln Nat'l*, 2022 WL 4091426, at *9 (concluding that even "[r]elevant common evidence does not automatically generate a common answer").

Plaintiffs' reply brief also demonstrates the class motion's commonality deficiencies.  Plaintiffs assert that "[a]s alleged and proven, the VA engaged in a [(1)] systemic failure to properly compensate class members [(2)] based on a hospital-wide practice or policy that affects all of the putative class members." Pl. Reply at 4–5.  Plaintiffs do not cite any record evidence for that bald assertion, but let's break it down anyhow.  The first part of the assertion — that there has been a "systemic failure to properly compensate class members" — is nothing more than a question-beginning hypothesis that restates Plaintiffs' overall claim that they are entitled to overtime pay.  The second part of the assertion — that there is a "hospital-wide practice or policy that affects all of the putative class members" — begs the additional question:  What is that "hospital-wide practice or policy"?[43]  Plaintiffs' reply brief does not identify one by name or substance.

---

[43] Notably, Plaintiffs themselves distinguish between the hospital's alleged "policy and practice of inducing work . . . and not providing adequate staffing and support." Pl. Resp. at 5.  There is

Now, perhaps Plaintiffs mean that "inducement through staffing levels" constitutes a "practice or policy." In that regard, this Court once again reiterates its general agreement that hospital conditions may well be relevant to a particular employee's claim of inducement. But that premise does not lead inexorably to class certification. For class certification purposes, the inducement question must be capable of being addressed with a common answer. *Dukes*, 564 U.S. at 345. Indeed, Plaintiffs agree that "the common question has to be capable of a common answer that would then resolve the issue for the entire class." Tr. 7:12–15. And while perhaps there are situations where common answers (about inducement via staffing levels) are possible such that a proposed class satisfies commonality, the evidence upon which Plaintiffs rely does not support such a conclusion here. *Cf. Smith v. United States*, 156 Fed. Cl. 471, 483 (2021) (rejecting plaintiff's "mistaken[]" reliance "on cases certifying collective actions where plaintiffs alleged that an employer's explicit policies violated the FLSA" and rejecting certification of collective action where an "individualized inquiry" was required). Indeed, "inducement through staffing levels" is akin to the class certification argument, rejected in *Dukes*, that Wal-Mart's "'strong corporate culture' made it 'vulnerable to gender bias.'" *In re Rail Freight Fuel Surcharge Antitrust Litig.* — *MDL No. 1869*, 934 F.3d 619, 627 (D.C. Cir. 2019) (quoting *Dukes*, 564 U.S. at 354 (quotation marks omitted in original)). As in *Dukes*, the evidence upon which Plaintiffs rely in this case is "insufficient to prove that injury could be established on a class-wide basis[.]" *Id.*

If Plaintiffs are referring to some other "practice or policy," what is it? How did it "affect[]" Plaintiffs or other potential class members? Plaintiffs do not answer those questions. Instead, Plaintiffs argue that "[t]he [common] questions are subject to common proof because it is the Northport facility's policies and practices in inducing such work that is the central question." Pl. Reply at 5. But that is just more of the same *ipse dixit*. Again, Plaintiffs cite no record evidence or explanation for the assertion that this Court can answer the inducement question across the proposed class.

In this case, there simply is no "evidence that defendant engaged in a common course of conduct directed at all the plaintiffs" or that "there is a common unlawful policy that that has injured the class as a whole." 7A Wright § 1763.1. In any event, the mere "allegation of a common policy . . . is insufficient to convert their case into a class action." *Palazon v. Fla. Dep't of Corr.*, 2006 WL 8433863, *2 (S.D. Fl. Aug. 18, 2006) ("Plaintiffs' claims are simply too individual-specific to show a common cause of action."). Nor is the fact that Plaintiffs are "all . . . suing the same Defendants under the same legal theory" sufficient to grant class certification. *Id.* at *3 (citing *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989)); *cf. Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006)

---

no evidence, however, of any policy or practice and, again, "not providing adequate staffing and support" does not equate, *per se*, to inducement. The fact that some individuals or groups of nurses may have had a practice of working through unpaid breaks is, manifestly, not the same as the agency or management imposing (or inducing) such a practice.

("The presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry.").

In sum, class actions exist primarily to allow for efficient and economical litigation, *Bright*, 603 F.3d at 1285, 1288, but such benefits are achieved only if the claims are bound together with core questions that are capable of a common answer, *see Dukes*, 564 U.S. at 349–50.  While from a distance the claims of the proposed class in this case share general similarities, they do not meet the rigorous analysis *Dukes* mandates.  To the contrary, the claims at issue raise a thicket of individualized questions that do not comport with a proper class action pursuant to RCFC 23.[44]

## 2.  Predominance and Typicality

For all of the above reasons,[45] this Court holds that Plaintiffs' motion also fails the "far more demanding" predominance requirement.  *Amchem Prods.*, 521 U.S. at 624; *see also Tyson Foods, Inc.*, 577 U.S. at 467 (quoting *Comcast Corp.*, 569 U.S. at 34).  "To demonstrate predominance under Rule 23(b)(3), we must analyze 'whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from [class] member to [class] member.'"  *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1156–57 (8th Cir. 2017) (alterations in original) (quoting *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 833 (8th Cir. 2016), and explaining that "individualized issues" of liability and damages were "considerations, unique to each class member's property, [that] complicate[d] class-wide resolution" to the point that "[t]oo many individual issues predominate over common ones").  At a minimum, Plaintiffs must demonstrate "the substantiality of the 'generalized proof' required to resolve certain issues . . . or the logical outgrowth of a challenge to a 'system-wide failure.'"  *Lohmann*, 154 Fed. Cl. at 370 (quoting *Curry*, 81 Fed. Cl. at 334).

Here, the "seemingly common question of 'is this employee due overtime?'" would require a "detailed, highly individualized inquiry" that "would have to be computed for each class member" in this case, as explained *supra*.  *Velasquez*, 303 F.R.D. at 442–43.  Given that the nature of evidence in this case will necessarily vary across Plaintiffs, "there are no common answers to common questions here" nor do they predominate; accordingly, "the claims are not appropriate for class certification."  *Id.*

---

[44] Plaintiffs agree that "there are going to be individual inquiries here" and that "[t]his is not a situation where the Court can look at this and say . . . it's yes or no and everyone is in or out."  Tr. 14:12–15; *see also* Tr. 14:12–25, 15:1–13, 18:5–25, 19:1–25, 20:1–18 ("[W]e envision a situation in which . . . liability is determined by chunks.").  Plaintiffs concede that they have not sought any subclass certifications pursuant to RCFC 23(c)(5).  Tr. 15:10–23.

[45] The Court recognizes that its commonality analysis (*i.e.*, whether a common question exists) touched upon predominance (*i.e.*, the balance between common and individual questions) already.

(citing *Enriquez v. Cherry Hill Mkt. Corp.*, 993 F. Supp. 2d 229, 235 (E.D.N.Y. 2013) (no commonality and class certification denied for a class of supermarket workers whose entitlement to overtime required an individualized examination of how much each employee worked and was paid during a given week)).  Indeed, Plaintiffs concede that "[t]he common answer" they propose would relate to the question "was there a situation in which induced overtime *could exist*."  Tr. 20:15–17 (emphasis added).  But even if the evidence shows that the proposed class would satisfy commonality and that working conditions were such that "induced overtime *could* exist," a conclusion on whether induced overtime *did* exist for each nurse requires inquiry into individualized material facts.  In that scenario assuming there is a common question on working conditions, the record does not suggest that resolving whether overtime could exist would predominate over individual questions and "greatly simplify the litigation," *Parko*, 739 F.3d at 1085.

The Third Circuit's *Ferreras* decision once again proves instructive.  Distinguishing that case's uncompensated work claims from those that would support class certification, the Third Circuit observed:

> The District Court cited *Tyson Foods, Inc. v. Bouaphakeo*, to support its conclusion that individualized variations should not defeat class certification.  But that case is clearly distinguishable.  In *Tyson Foods*, the class consisted of employees at a pork processing plant who were not compensated for the time spent donning and doffing the protective equipment they had to wear at work.  The issue before the Supreme Court was whether representative evidence could be used to prove the amount of time spent donning and doffing, even though individual employees took different amounts of time to perform those tasks.  There was, however, no dispute about what the activity was that Tyson and the employees were arguing over.  It was the same for everyone ─ donning and doffing protective gear.  The record evidence here, on the other hand, demonstrates that employees were not always working while clocked in and there was substantial variability in what they were doing, even if some of it could be called work.  Accordingly, this case is unlike *Tysons Foods*, and the employees would need individualized, not representative, evidence to prove their case.  Thus, predominance cannot be established.

*Ferreras*, 946 F.3d at 186–87 (3d Cir. 2019) (citations omitted) (discussing *Tyson Foods,* 577 U.S. 442).

Measuring damages here similarly presents an insurmountable obstacle to class certification in this case. *Comcast Corp.*, 569 U.S. at 34 (rejecting class proponents' methodology for calculating classwide damages where the absence of such a methodology meant "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class"); *see also Cole*, 322 F.R.D. at 507. In *Cole*, the district court denied class certification where the plaintiff did "not propose[] any method for measuring . . . damages" such that "[a] trial within a trial would likely ensue for each class member seeking actual damages so as to establish . . . the extent of [plaintiff's] injury as it relates to [defendant's] liability." *Id.* As in *Cole,* Plaintiffs here "do[] not need to show that each [of their] damages are identical," but they "must establish a means for measuring damages on a classwide basis that is traceable to [defendant's] conduct." *Id.* Plaintiffs have "failed to present any such method" here. *Id.* This Court recognizes that, post-*Comcast*, a number of lower courts have limited *Comcast* to its facts,[46] but this Court is convinced that where, as here, individualized damages questions would overwhelm any possible common liability question, class certification should be denied. The Supreme Court's directive, in that regard, is unambiguous. *See Comcast*, 569 U.S. at 34 (explaining that the Court's conclusion "turns on straightforward application of class-certification principles" and not "substantive antitrust law").

This Court concludes that the putative class representatives' claims are typical of the broader putative class only in the most general sense that they involve overtime claims based on alleged work performed during unpaid breaks. That level of generality, however, is not sufficient to overcome Plaintiffs' failure to demonstrate commonality and predominance.[47]

---

[46] *See, e.g., In re Whirlpool*, 722 F.3d at 861 (holding *Comcast* "has limited application" where "determinations on liability and damages have been bifurcated" (citation omitted)); *Giles v. St. Charles Health Sys., Inc.*, 294 F.R.D. 585, 594 (D. Or. 2013) ("[N]othing in *Comcast* indicates that this presumption [about damages' measurement] is applicable to wage and hour claims under federal and state law.").

[47] Typicality and adequacy requirements make little to no sense in an opt-in class action. Elizabeth K. Spahn, *Resurrecting the Spurious Class: Opting-in to the Age Discrimination in Employment Act and the Equal Pay Act Through the Fair Labor Standards Act*, 71 Geo. L. J. 119, 146 (1982) ("The major policy served by the typicality and adequacy of representation requirements is to protect absent class members . . . . In [an opt-in] class action[], however, the concern with protection of absent class members is not applicable because the only class members bound by the judgment are present, having opted-in . . . . To tack on the adequacy . . . and typicality requirements is simply redundant."); *id.* at 149 ("Except for the common question of law or fact criterion, which permits the court to determine whether a class action would promote judicial efficiency, the requirements of [FRCP] 23(a) class actions should not apply to opt-in cases."). Regardless, as previously noted, this Court has no concern with the adequacy requirement as it relates to class counsel's qualifications or the risk of conflicts among proposed class members. *See supra* subsection III.C.3 & note 31. This Court doubts very much whether adequacy concerns make sense in an opt-in class action, where plaintiffs are only bound by the result if they elect to

**B.  The Plaintiffs Have Not Met Their Burden to Demonstrate Numerosity or Superiority**

The Court, at the risk of repeating itself, notes once again what the numerosity and superiority requirements demand.  The numerosity requirement calls for this Court to assess whether proceeding via "joinder is impracticable," and the superiority requirement directs the Court to assess whether a class action "is the fairest and most efficient method of resolving the suit."  *Common Ground Healthcare*, 137 Fed. Cl. at 637; *see* RCFC 23(a)(1), (b)(3).  The two questions are related; each question requires the Court to compare a class action approach with viable alternatives (*i.e.*, is joinder impracticable, and would class action be better than joinder or separate litigation).  Even where a theoretical group of plaintiffs can practicably use joinder to pursue litigation together, such a proceeding may not be superior to a class action proceeding.  In that regard, this Court agrees with the United States Court of Appeals for the Seventh Circuit that what a court ultimately must decide is whether a class action makes the most sense as a litigation vehicle given the particular claims at issue:

> The purpose of class action litigation is to avoid repeated litigation of the same issue and to facilitate prosecution of claims that any one individual might not otherwise bring on her own.  The [trial] court's task . . . [is] to determine if the plaintiffs[] presented a scenario in which judicial efficiency would be served by allowing their claims to proceed en masse through the medium of a class action rather than through individual litigation.

*Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015) (acknowledging that "[o]ur analysis is not free-form, but rather has been carefully scripted by [FRCP 23]").

The difficulty, from this Court's perspective, is that usual numerosity and superiority considerations seem to be almost completely inapposite in an opt-in class action framework.  That is because an opt-in class action itself "resembles permissive joinder in that it requires affirmative action on the part of every potential plaintiff." *Buchan v. United States*, 27 Fed. Cl. 222, 223 (1992) (explaining that an opt-in class action "allows each of the unnamed members of the class the opportunity to appear and include themselves in the suit if each is willing to assume the risks of the suit").  Indeed, "'opt-out' class actions" — available in district court pursuant to FRCP 23 — "superseded the former 'spurious' class action [in 1966], so characterized because it generally functioned

---

enter the case.  In other words, in an opt-in class action — by definition — there are no absent parties with which a court need be concerned.  The Court does not address these considerations further.

as a permissive joinder ('opt-in') device." *Amchem Prods.*, 521 U.S. at 615 (first citing 7A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1753 (2d ed. 1986); and then citing Advisory Committee Notes on FRCP 23, 1966 amendment).[48]   Moreover, permissive joinder itself requires some level of commonality.[49]  In short, the comparisons between permissive joinder and opt-in class actions are impossible to ignore.  Even their respective purposes appear to be largely the same.  *Swan v. Ray*, 293 F.3d 1252, 1253 (11th Cir. 2002) (per curiam) (explaining that the central purpose of Rule 20 [joinder] is "to promote trial convenience and expedite the resolution of disputes, thereby eliminating unnecessary lawsuits." (quotation omitted)).  The undersigned is not the first judge of this Court to recognize this problem of applying numerosity and superiority to opt-in class actions.  As Judge Lettow noted, "[n]umerosity as a criterion is somewhat of an anomaly for an opt-in class action" where "each participating member of the class must act affirmatively to participate, which amounts to joinder in pragmatic terms."  *Haggart v. United States*, 89 Fed. Cl. 523, 530 (2011).

Given the similarities between permissive joinder and an opt-in class action, the Court does not see how numerosity or superiority weigh in favor of either Plaintiffs or

---

[48] *Compare Kainz v. Anheuser-Busch, Inc.*, 194 F.2d 737, 743 (7th Cir. 1952) ("[I]nasmuch as [then-operative] Rule 23(a)(3) [governing opt-in class actions] is, in its essence, a permissive joinder rule rather than a rule defining a recognizable class, it is obvious that the two rules" — *i.e.*, FRCP 20(a) on joinder and FRCP 23(a)(3) — "are, as to the intents and purposes involved here, equivalents. Everything we have said as to one applies with equal force to the other."); *Carroll v. Associated Musicians of Greater N.Y.*, 206 F. Supp. 462, 469–70 (S.D.N.Y. 1962) ("The 'spurious class suit' is merely a device for permissive joinder" and serves as "an invitation to the members of the affected class to join in the action.  If they do not so join they cannot be bound by the result." (quoting *Mutation Mink Breeders Assn. v. Lou Nierenberg Corp.*, 23 F.R.D. 155, 162 (S.D.N.Y. 1959))), *aff'd*, 316 F.2d 574 (2d Cir. 1963); *with Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 519 (2d Cir. 2020) ("In 1966, Rule 23 was amended to resemble its modern form, including for the first time Rule 23(a)'s requirements of commonality, typicality, numerosity, and adequacy, and Rule 23(b)(3)'s requirements of predominance and superiority.  Along with these revisions, the drafters also omitted the opt-in requirement contained in the former 'spurious' class action device and replaced it with Rule 23(b)(3)'s opt-out requirement." (citations omitted)), *cert. dismissed*, 142 S. Ct. 639 (2021) (mem.).

[49] *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1202 n.46 (11th Cir. 2007) (noting that the requirement that "plaintiffs' claims involve common questions of law or fact" is "shared by traditional class actions" pursuant to FRCP 23 and "permissive joinder under [FRCP] 20(a)"); *Lee v. Cook Cnty.*, 635 F.3d 969, 971–72 (7th Cir. 2011) (noting that "[m]ultiple plaintiffs are free to join their claims in a single suit when '*any* question of law or fact common to all plaintiffs will arise in the action'" but that "[t]he common question need not predominate" because "that's a requirement for class actions, not for permissive joinder" (quoting FRCP 20(a)(1)(B))); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966) ("Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.").

the government, at least in this particular case.[50]  *Cf. Zachman v. Erwin*, 186 F. Supp. 681, 689–90 (S.D. Tex. 1959) ("Actually, the court does not see what advantage plaintiffs seek to gain by maintaining a class action under [the former, opt-in] Rule 23(a)(3), since a judgment would only bind the original parties and intervenors and since, as will be shown, there is no jurisdictional advantage to be gained.").[51]  Just as in a permissive joinder case (known as a "spurious" class action under prior versions of the FRCP), each plaintiff in this case — whether named, representative, or opt-in — will ultimately have to demonstrate entitlement to a specific money judgment even if the class were certified. *Athas v. Day*, 186 F. Supp. 385, 389 (D. Colo. 1960) ("[E]ach party to a spurious class action must stand or fall on his own allegations and evidence in support thereof.").

Perhaps the Court might be inclined to assess both numerosity and superiority differently if proceeding via class action would (a) create some efficiencies (*e.g.*, in discovery),[52] or (b) allow the pooling of claims that would otherwise be uneconomical to litigate.  But, to the extent that the point of a class action here would be simply to generate a court-ordered notice to prospective plaintiffs, this Court's view is that, in general, "Rule 23 should not be used as a device to enable client solicitation."  *Escott v. BarChris Const. Corp.*, 283 F. Supp. 643, 706 (S.D.N.Y. 1968) (internal quotation marks omitted) (quoting *Cherner v. Transitron Elec. Corp.*, 201 F. Supp. 934, 936 (D. Mass. 1962)); *see also Flanigan v. Am. Fin. Sys. of Ga., Inc.*, 72 F.R.D. 563, 563 (M.D. Ga. 1976) ("Rule 23 should not be used as a device to enable client solicitation." (internal citation and quotation marks omitted)).  "This is not the purpose of a class action, in which the representative parties litigate

---

[50] Although the government "do[es] not dispute that [P]laintiffs have met the numerosity . . . requirement[]," Def. Resp. at 20 n.11, a proposed class merits certification "only if" it satisfies all of Rule 23's requirements, RCFC 23(a).  *See supra* notes 15, 35, and accompanying text; *see also Dukes*, 564 U.S. at 350.  The Court agrees that the size of the putative class here generally satisfies RCFC 23's numerosity requirement — *see* Pl Mot. at 18 (arguing that "[g]enerally, more than 40 proposed class members satisfies the numerosity requirement") — but the various numerical thresholds courts have relied upon are not dispositive *per se* and only make sense in **opt-out** class actions, where a certified class means the named or representative plaintiffs are able to avoid difficulties associated with joining other parties.  As explained, *infra*, opt-in class actions may still encounter such difficulties.

[51] *But cf. Leist v. Shawano Cnty.*, 91 F.R.D. 64, 67 (E.D. Wis. 1981) (considering whether any "individual class member has a financial stake likely to provide the incentive for individual litigation").

[52] *Cf. Kutzback v. LMS Intellibound, LLC*, 2020 WL 1317345, at *9 (W.D. Tenn. Mar. 17, 2020) (observing that, under the FLSA, "[s]ome federal courts have held that defendants can seek individualized discovery as to each opt-in plaintiff, while other courts have limited discovery to a representative sample" (footnotes omitted)).

common issues on behalf of . . . class members." *Maenner v. St. Paul Fire & Marine Ins. Co.*, 127 F.R.D. 488, 491 (W.D. Mich. 1989).[53]

Here, Plaintiffs have not explained why "a class action would achieve economies of time, effort, and expenses" or "promote uniformity." Pl. Mot. at 27 (quoting *Barnes*, 68 Fed. Cl. at 499). Plaintiffs assert that "joinder of potentially several hundred class members . . . under RCFC 23(a) is impractical," and thus urge that "the superiority analysis should be limited to a comparison between the benefits of individual litigation versus those of a class action." Pl. Mot. 28. Given the Court's analysis above, it is easy to understand why Plaintiffs seek to avoid a comparison to joinder — there is little articulable difference between joinder and an opt-in class action (with the exception of the court-ordered notice pursuant to RCFC 23(c)(2)). Moreover, in the same breath that Plaintiffs urge this Court to find that the proposed class action is superior to other methods of resolving the claims at issue, Plaintiffs acknowledge that there are already "200 plus named Plaintiffs." *Id.*[54] This fact undercuts the notion that joinder here is impracticable; Plaintiffs and their counsel seem to have had no difficulty gathering would-be litigants. *See Bell*, 123 Fed. Cl. at 407–08 (rejecting class certification where "joinder is an available option" and where "[p]laintiffs declined to address . . . the circumstance in which additional plaintiffs might join the existing action").

With respect to the pooling of uneconomic claims, a class action could provide benefits that alternative approaches cannot. "Modern plaintiff class actions" — in addition to "permitting litigation of a suit involving common questions when there are

---

[53] *Cf. Robertson*, 287 F. App'x at 363 (considering whether there is anything "to be gained from invoking the notice requirements associated with [class actions that satisfy] Rule 23(b)(3), which are designed to identify and notify class members who are unaware of the suit").

[54] It is far from clear to this Court or the parties whether opt-in plaintiffs have the status of named party plaintiffs or not (*e.g.*, for discovery purposes). Tr 20:19–25, 21:1–16, 25:2–14, 55:16–25, 56:1–17; *McCoy v. Elkhart Prods. Corp.*, 2021 WL 5015625, at *1 n.1 (W.D. Ark. Oct. 28, 2021) (noting that the FLSA, 29 U.S.C. § 216(b), "is clear that a similarly situated employee who opts in to a collective action is joined as 'a party plaintiff'" and that a "collective action is merely a more efficient mechanism to effect permissive joinder of parties than requiring the complaint to be amended by adding an employee's name to the docket and their individual allegations to the complaint every time an employee opts in"); *but see Kutzback*, 2020 WL 1317345, at *9 ("While it is true that Opt-In Plaintiffs are 'party plaintiffs' as they affirmatively consented to opt into the class, Defendants are incorrect in stating that all opt-in plaintiffs are subject to full discovery." (citations omitted)); *Fischer v. Fed. Express Corp.*, 42 F.4th 366, 376–77 (3d Cir. 2022) (explaining that the opt-out "Rule 23(a) [class action] explicitly contemplates the named plaintiff or defendant acting as a 'representative part[y],'" FRCP 23(a), and observing that "[i]n contrast, an opt-in plaintiff under [the FLSA] becomes a 'party plaintiff'" (quoting 29 U.S.C. § 216(b)). By defining FLSA opt-in plaintiffs as "party plaintiffs," the statute indicates "opt-in plaintiffs should have the same status in relation to the claims of the lawsuit as do the named plaintiffs." *Prickett v. DeKalb Cnty.*, 349 F.3d 1294, 1297 (11th Cir. 2003) (per curiam).

too many plaintiffs for proper joinder" — "also may permit the plaintiffs to pool claims which would be uneconomical to litigate individually." *Phillips Petroleum Co.*, 472 U.S. at 808–09 ("For example, this lawsuit involves claims averaging about $100 per plaintiff; most of the plaintiffs would have no realistic day in court if a class action were not available."). The problem here is that Plaintiffs made no effort to argue that this consideration weighs in favor of granting their class certification motion. Pl. Reply at 7 (acknowledging that "Plaintiffs did not address [this] one factor" but arguing that their omission "does not disprove superiority"). The Court will not make this argument for the Plaintiffs any more than it will make arguments for the government. *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 289 (2021) ("[T]he Court will not make this argument for the government[.]").

In sum, this Court concludes that Plaintiffs have not carried their burden on numerosity or superiority, although neither factor clearly favors the government.

## V.   NEXT STEPS

For the government, this may well turn out to be a case of "be careful what you wish for" — the fact that the government prevails (for now[55]) hardly makes this case's management any easier. For example, the government must now decide whether to pursue a motion to sever some (or all) of the already named plaintiffs and/or to oppose the joinder of further plaintiffs. And that raises yet a further difficult question: whether proceeding with perhaps several dozen or hundreds of individual cases would make everyone's work easier or harder. The way forward is by no means obvious to this Court.

Accordingly, the parties shall meet-and-confer and submit a joint status report regarding how this case should proceed. In particular, the parties must provide a comprehensive case management plan, addressing:

1.   how the claims of Plaintiffs who already have joined this case will proceed, including whether the Court should utilize a bellwether-type approach;[56]

---

[55] As noted below, Plaintiffs' motion is denied *without* prejudice. *See, e.g., Smith v. United States*, 156 Fed. Cl. 471, 476 (2021) (denying "Plaintiff's request for nationwide conditional certification . . . without prejudice"); *Crawley*, 2021 WL 252838, at *11.

[56] *In re Upstream Addicks & Barker*, 157 Fed. Cl. at 194, 201–02 (discussing the parties' "bellwether approach" in the context of a class action certification motion); *3rd Eye Surveillance, LLC v. United States*, 155 Fed. Cl. 355, 362 (2021) ("The sprawling nature of this case and numerous prior discovery disputes previously led the court to limit discovery to eleven potential infringing systems that will serve as bellwethers for further proceedings." (internal quotation marks omitted)); *Ideker Farms, Inc. v. United States*, 151 Fed. Cl. 560, 567 (2020) (discussing "bellwether" approach); *Mississippi v. United States*, 2020 WL 837939, at *2 (Fed. Cl. Feb. 20, 2020) ("[T]he parties are encouraged to consider the procedures employed to adjudicate similar complex, multi-

2. how discovery on the merits will be conducted;[57]

3. whether, despite having denied Plaintiffs' motion to certify a class, this Court nevertheless should facilitate the joinder of additional plaintiffs;[58] and

4. a proposed schedule to resolve this case.

Should the evidence ultimately show that class resolution may be possible for particular groups of nurses, Plaintiffs may be granted leave to renew their motion for class certification at a future date.

---

plaintiff takings cases such as *Ideker Farms v. United States*, No. 14-183, and *In Re Addicks and Barker (Texas) Flood-Control Reservoirs*, No. 17-3000, including the bifurcation of the liability and damages portions of the cases as well as the selection of representative (or 'bellwether') plaintiffs."); *Henry Hous. Ltd. P'ship v. United States*, 121 Fed. Cl. 537, 539 (2015) (explaining that "the court selected four of the cases to serve as bellwether actions that might represent most of the factual variations within the larger group, and which when resolved might provide a template for disposition of all the cases").

[57] In an opt-out class action, "[u]nlike a defendant in a normal civil suit, an absent class-action plaintiff is not required to do anything." *Phillips Petroleum Co.*, 472 U.S. at 810. But, in an opt-in class action, there are no absent plaintiffs. This implies, of course, that an opt-in class action permits discovery from all plaintiffs who join the suit. *Cf. McPhail v. First Command Fin. Plan., Inc.*, 251 F.R.D. 514, 517 (S.D. Cal. 2008) (explaining that "a defendant who propounds discovery upon absent class members requires those members to take some affirmative action to remain in the class, 'effectively creating an 'opt in' requirement which is inconsistent with the 'opt out' provisions of Rule 23'" (quoting *On the House Syndication, Inc. v. Fed. Express Corp.*, 203 F.R.D. 452, 456 (S.D. Cal. 2001))); *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) ("A defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues.").

[58] *See* RCFC 14(b); RCFC 16(b)(3); RCFC 16(c)(2)(L); RCFC 83(b); *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170–74 (1989) (explaining that "[c]ourt authorization of notice serves the legitimate goal of avoiding a multiplicity of duplicative suits" in the context of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, and cautioning that "[i]n exercising the discretionary authority to oversee the notice-giving process, courts must be scrupulous to respect judicial neutrality"); *Doe No. 1 v. United States*, 148 Fed. Cl. 437, 439–40 (2020) (discussing *Hoffmann-La Roche* in the context of the FLSA and holding that " a court-facilitated notice process is both a permissible and effective means of providing plaintiffs with the ability to communicate with prospective party-plaintiffs in order to assemble a proposed collective action"); *cf. United States v. Cook*, 795 F.2d 987, 993 (Fed. Cir. 1986) (discussing trial court's "ordering production of names and addresses of potential class members to facilitate notifying them of a pending FLSA action"); *Valte v. United States*, 155 Fed. Cl. 561, 573–74 (2021) (discussing *Hoffmann-La Roche* and "good case management practices" pursuant to RCFC 83(b) and 16(b)); *Swales v. KLLM Transp. Servs., LLC*, 985 F.3d 430, 443 (5th Cir. 2021) ("The bottom line is that the district court has broad, litigation-management discretion here."); *In re EMC Corp.*, 677 F.3d 1351 (Fed. Cir. 2012) (addressing joinder and severance pursuant to FRCP 20).

## VI.    CONCLUSION

For all of the above reasons, Plaintiffs' motion to certify a class action is, hereby, **DENIED**, without prejudice.  The parties shall file the joint status report ordered herein on or before November 21, 2022.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
**Matthew H. Solomson**
**Judge**
